# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2015


## STATE OF TENNESSEE v. JEFFREY OWEN SMITHSON

### Appeal from the Circuit Court for Coffee County
### No. 38951     Vanessa Jackson, Judge

_____

### No. M2015-00863-CCA-R3-CD – Filed February 12, 2016

_____


Jeffrey Owen Smithson ("the Defendant") appeals from his convictions for first degree felony murder, theft over $1,000, first degree premeditated murder, and especially aggravated robbery. The Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in denying his motion for mistrial based upon a witness's testimony that the Defendant had been recently released from prison; and (3) the trial court erred in denying the Defendant's motion to suppress his statement to police as not voluntarily given. Upon review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT L. HOLLOWAY, JR., J. delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

John Nicoll, District Public Defender; and Margaret C. Lamb, Assistant District Public Defender, Tullahoma, Tennessee, for the appellant, Jeffrey Owen Smithson.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Craig Northcott, District Attorney General; and Marla R. Holloway, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

This appeal involves the murder of the Defendant's aunt, eighty-one-year-old Virginia White, in her home in Coffee County on August 16, 2011. The Defendant had lived with the victim at the time of the offense. However, when officers discovered the victim's body on August 17, the Defendant and the victim's car were missing. The next day, police found the Defendant with the victim's car in Cannon County, at which time the Defendant was taken into custody. The Defendant gave a statement to police in which he admitted to killing the victim.

In October 2011, the Coffee County Grand Jury indicted the Defendant for first-degree felony murder, theft of property over $1,000, first-degree premeditated murder, and especially aggravated robbery in connection with the victim's death. The State then filed a notice of intent to seek life without parole.

### Motion to Suppress

Prior to trial, the Defendant filed a motion to suppress his statement. At a hearing on the motion, Investigator Ray "Butch" Stewart, Jr. of the Manchester Police Department testified that, on August 18, 2011, he responded to a wooded area in Cannon County after receiving an alert that the victim's vehicle had been located there. Investigator Stewart recalled that, as he and several other officers approached the victim's car, he saw movement inside the vehicle and then a hand reaching toward the car's rearview mirror. Investigator Stewart pulled out his weapon and yelled, "Let me see your hands." The occupant of the car immediately complied and stuck his hands out of the car window. Investigator Stewart ordered the occupant, whom he recognized as the Defendant, to turn around and walk backwards towards him. The Defendant followed Investigator Stewart's verbal commands and was able to walk backwards toward the sound of his voice without stumbling or falling.

Investigator Stewart testified that he conducted a pat down of the Defendant at the back of the victim's car. Although in a report Investigator Stewart later described the Defendant as looking "sick," he explained that the Defendant looked "worn out" and had lost a lot of weight since the last time that he had seen the Defendant. However, the Defendant was not trembling or vomiting and did not appear to be in pain at the time of his arrest. As the Defendant was being handcuffed, Chief Mark Yother asked the Defendant if he knew why officers were there, and the Defendant "shook his head yes." The Defendant also recognized Investigator Stewart and asked if Investigator Stewart remembered him. Investigator Stewart testified that Chief Yother then read the

Defendant his <u>Miranda</u> rights, and the Defendant indicated that he understood those rights. Although Investigator Stewart remained with the victim's car when the Defendant was transported to the police department, Investigator Stewart testified that he engaged in small talk with the Defendant later that day at the station and the Defendant did not appear to be under the influence of drugs or alcohol.

Chief Mark Yother of the Manchester Police Department testified that, around 3:00 p.m. on August 18, 2011, he accompanied Investigator Stewart to the location of the victim's car in a wooded area in Cannon County. He recalled that Investigator Stewart saw movement inside the car as they approached and Investigator Stewart ordered the occupant of the car, who was later identified as the Defendant, to "get his hands up and . . . out the window." Chief Yother testified that the Defendant had no problems understanding and complying with Investigator Stewart's directions. Chief Yother agreed that, in his thirty years in law enforcement, he had had the opportunity to deal with individuals who were intoxicated due to drugs and alcohol. However, he stated that the Defendant did not appear to be intoxicated when taken into custody.

Chief Yother testified that he advised the Defendant of his <u>Miranda</u> rights and the Defendant said that he "understood his rights and knew what he was doing." Chief Yother then walked the Defendant back to the roadway and let the Defendant smoke a cigarette. Chief Yother testified that the Defendant had no trouble walking out of the woods and the Defendant did not appear to be injured in any way. Officers placed the Defendant in the back of a patrol car, and Chief Yother rode to the police department in the backseat with the Defendant. Chief Yother stated that, during the ride, the Defendant assisted the officers with directions in getting back to the main highway. As the Defendant gave the officers directions, he explained that he had grown up in the area. Chief Yother then asked the Defendant to tell him "what happened at [the victim's] house." The Defendant said that, after lunch on Tuesday, August 16, he was in a bedroom at the victim's house when the victim came into the room "fussing about him using drugs and about him being on drugs." The Defendant stated that the victim slapped him during this confrontation and, in response, he "knocked the hell out of [the victim]." The Defendant admitted that he hit the victim more than one time. The Defendant also "remembered getting the pantyhose out of a drawer in the bedroom" but did not remember strangling the victim with the pantyhose. The Defendant stated that he took morphine but he had not had any on the day of the offense and he was "dope sick" at the time of the offense. The Defendant told Chief Yother that, after he killed the victim, he went into the bathroom and cried for a "long time." He stated that it was dark outside when he left the bathroom. According to Chief Yother, the Defendant also admitted to stealing the victim's jewelry, some coins, and her car. Then, the day after the murder, the Defendant and a friend went to McMinnville to get some parts for a vehicle that they had been working on. On the morning of August 18, the Defendant obtained and "shot up"

morphine. Chief Yother testified, however, that the Defendant did not seem confused, intoxicated, or high on drugs at the time of his arrest and statement. Chief Yother denied that he had threatened the Defendant, used physical force, or promised the Defendant anything in connection with his statement. He recalled that he patted down the Defendant once they arrived at the police department and found some dollar and half dollar coins that the Defendant admitted belonged to the victim.

Investigator Billy Butler with the Manchester Police Department testified that he accompanied Investigator Stewart and Chief Yother to Cannon County and assisted in taking the Defendant into custody. Investigator Butler stated that the Defendant did not appear to be under the influence of drugs or alcohol at that time. He recalled that the Defendant complied with Investigator Stewart's commands and that the Defendant seemed to understand his Miranda rights as read by Chief Yother. Investigator Butler testified that he did not participate in the conversation between the Defendant and Chief Yother during the ride to the police department. However, Investigator Butler stated that he did not see Chief Yother assert physical force against the Defendant or hear any threats or promises to the Defendant.

Investigator Butler testified that, once at the police department, he, Chief Yother, and Special Agent Kendall Barham of the Tennessee Bureau of Investigation (TBI) met with the Defendant in the chief's office. They removed the Defendant's handcuffs and gave the Defendant a bottle of water. The Defendant did not appear ill nor did he seem to be under the influence of drugs or alcohol. Investigator Butler described the Defendant as "very cooperative" and "a little remorseful." Chief Yother explained to the Defendant that they wanted to go back over the Defendant's statement and reduce it to writing. Investigator Butler provided the Defendant with a Miranda rights waiver form, and the Defendant initialed each of the rights listed on the form, indicating that he understood each of the rights as Investigator Butler explained them. After signing the waiver, the Defendant repeated his statement, one sentence at a time, so that Investigator Butler could reduce the statement to writing. The Defendant then reviewed the two-page written statement and signed it. Investigator Butler testified that the Defendant did not appear ill, confused, or intoxicated during this time. Moreover, he did not see any needle marks on the Defendant's arms.

At the conclusion of the hearing, the trial court stated that the evidence was "pretty overwhelming" that the Defendant's statement was voluntary. The trial court found that the agents of the State "fully complied with Miranda requirements" and that the Defendant "made a knowing and voluntary waiver of his rights." The court found that the Defendant was "by all proof not impaired" at the time he gave his statement to police. The Defendant followed the officers' directions, demonstrating coordination by walking backwards in a wooded area towards Investigator Stewart's voice. The Defendant also

- 4 -

gave a detailed, "cogent narrative" of the events surrounding the murder. The Defendant's emotions of having remorse were appropriate for the situation, and the Defendant stated that he understood his <u>Miranda</u> rights and knew why officers were arresting him. Regarding Investigator Stewart's mentioning in a report that the Defendant appeared "sick", the trial court accredited Investigator Stewart's explanation that he had not seen the Defendant in years and that the Defendant had lost weight, giving the appearance that the Defendant had an illness. The trial court concluded that there was no evidence that the Defendant's statement was involuntary or that the Defendant did not know what he was doing when he made the statement and, accordingly, denied the Defendant's motion to suppress.

*Trial*

At the Defendant's subsequent trial, Investigator Stewart, Chief Yother, and Investigator Butler testified consistent with their testimony at the hearing on the motion to suppress. Investigator Stewart additionally testified that he secured a video from Elk River Public Utility District during the investigation based upon information from the Defendant that he had accompanied the victim there on the day of the offense. The video showed the victim at the utility company at 3:34 p.m. on August 16, 2011, wearing the same clothes that she had on when Investigator Stewart discovered the victim's body.

Edward "Kent" Stewart testified that the Defendant was his first cousin, and the victim was his mother. Kent[1] explained that, before her death, he and the victim were "very close" and they spoke on the phone nearly every day. He usually called the victim on his way to work between 3:00 and 4:00 p.m. Kent testified that the last time he spoke to the victim was on August 16, 2011. He called the victim around 4:00 p.m., and they talked for about eight minutes. During their last phone call, the victim "seemed fine." Kent testified that, several days before the murder, he learned that the Defendant was staying with the victim. He asked the victim about the Defendant, and she said that the Defendant was outside smoking.

Later that night, while he was at work, Kent received a phone call from his brother Timothy Stewart, who was upset because he could not reach the victim by phone. Kent explained that, on a previous occasion a month before, Timothy had been unable to get in touch with the victim when she had gone out to eat with friends and forgotten her cell phone. Kent told his brother, "Don't get excited because you know what happened last time. She's probably just out with somebody[.]" Kent suggested that Timothy should ask the victim's friend, Mary Piscola, to check on the victim.

---

[1] Because several witnesses share a surname, we will refer to those witnesses by their given name. We intend no disrespect.

After he was notified that Ms. Piscola and police officers had discovered the victim's body, Kent left work and went to the victim's residence. He stated that, when he arrived, the scene was taped off and he was not allowed into the home. Investigator Stewart brought out the victim's purse, and Kent and Timothy looked through it. They found the victim's cell phone, checkbook, and a wallet containing her credit cards. However, there was no cash in the victim's purse, and Kent testified that was unusual as the victim always kept twenty to thirty dollars in cash in her wallet.

Kent testified that, in August 2011, his mother owned a 1989 Mercury Grand Marquis, and the parties stipulated that the victim's car was worth at least $500 on August 16, 2011. Kent explained that the victim was "very particular" about whom she let drive her car, and she only let her sons drive it. Kent was then asked to identify a box of jewelry and seven or eight pocket knives that belonged to the victim. Kent stated that, although the victim had moved about three weeks before her murder, she would not have left these items in the trunk of her car after the move. Kent identified a baggie containing rings that was found in the center console area of the victim's car as belonging to the victim. He testified that the value of the jewelry stolen from the victim was more than $500. He was shown a silver box containing a syringe and paraphernalia, and Kent testified that he did not recognize those items as belonging to his mother. Kent stated that the victim did not store personal belongings in her car. He explained that, during a move, the victim would typically place valuable items in the backseat of her car and put her clothes in the trunk.

Kent testified that when he was allowed back inside the victim's residence after her death, he noticed that there were still several boxes scattered about the residence and that the middle bedroom and hallway contained boxes that were not yet unpacked. Kent testified that the victim stayed in a back bedroom and that this bedroom contained a vanity where the victim kept a lot of her jewelry. Kent noticed that there were empty drawers in the vanity where the victim kept a lot of her jewelry. He agreed, however, that there were still a number of valuables in the victim's home. Kent recalled that, as he went through a dresser drawer in his mother's bedroom, he found cigarette ashes in the drawer. Kent thought that the cigarette ashes were "real odd" because the victim did not smoke and would not allow anyone else to smoke in her home.

During Kent's testimony, the parties entered a stipulation based upon phone records that the Defendant's wife called the victim's home on August 16, 2011, at 7:16 p.m. and that the call lasted eight minutes. The parties also stipulated that there were no other incoming or outgoing calls to or from the victim's home after the call from the Defendant's wife.

- 6 -

Timothy Stewart, the victim's son, testified that he had spoken to his mother on the phone every day before her murder.  Timothy explained that, on July 22, 2011, he had not been able to reach the victim on the phone and "panicked."  He cancelled everything he had planned that day and drove to Manchester to check on the victim.  When he got to her residence, Timothy found that the victim, who was in the process of moving, had left her cell phone in her car.  Timothy testified that the victim was not completely unpacked when she died but that the victim would not have left valuable family heirlooms in the trunk of her car after a move.

Timothy recalled that, on the morning of Tuesday August 16, the victim called and asked him if he would buy a bus ticket to Florida for the Defendant.[2]  The victim told Timothy that she did not want the Defendant at her house any longer and that the only way to get the Defendant out of her house was to buy him a bus ticket.  Timothy explained that the victim did not want to hurt the Defendant's feelings so she whispered while on the phone talking about wanting the Defendant to go to Florida.  Timothy agreed to buy the ticket and told the victim to check with the Defendant to make sure that the Defendant was ready to go.  Timothy offered to come to Manchester and "get [the Defendant] on a bus that day," but the victim thought that would be "rushing it too soon."  Timothy testified that the victim was supposed to call him back that afternoon but failed to do so.  Timothy called the victim several times the following day, August 17, but could not reach her.  He then called one of the victim's friends, Mary Piscola, and asked that she check on the victim.  Ms. Piscola called Timothy back and reported that the lights were off in the victim's apartment, but the television was on.  She explained that all of the doors were locked from the inside.  Timothy asked Ms. Piscola to call 911.  Ms. Piscola later called back, "hysterical."  A police officer then got on the phone and informed Timothy that the victim was deceased.

Timothy testified that, after receiving this news, he and Kent went to the victim's residence in Manchester.  At the residence, they discovered that the victim's 1989 Mercury Grand Marquis was gone.  Timothy estimated that the car was worth between $3,000 and $5,000.  Officers gave Timothy and Kent the victim's purse, and they noticed that it contained no cash.  Timothy testified that this was unusual because the victim usually kept between twenty and thirty dollars in cash in her wallet.  He then identified a baggie of rings, as well as several necklaces, knives, watches, and stick pins, as belonging to the victim.  Timothy was next shown a bag of coins that had been found under the driver's seat in the victim's car, and he identified the coins as coming from the victim's coin collection. He explained that, before her death, the victim kept her coin collection in a drawer and placed clothing on top of it.  Timothy estimated that the coins and jewelry found in the victim's car were worth several thousand dollars.  Timothy

---

[2] Timothy explained that the Defendant's wife lived in Florida.

recalled that he later went into the victim's residence and went through her possessions. He discovered some jewelry—mostly costume pieces—inside the apartment. However, the victim's "nicer jewelry" was never found.

According to Timothy, at the time of the victim's murder, the Defendant did not own a vehicle. Timothy recalled that, in February 2011, the Defendant had asked the victim if he could borrow her car to pick up his wife from the airport. The victim told Timothy that she did not want the Defendant driving her car. Thereafter, Timothy informed the Defendant's wife that the victim was not going to drive to Chattanooga to pick her up and the Defendant was not going to borrow the victim's car.

Mary Piscola, a friend of the victim, testified that she received a call from Timothy around 7:00 or 7:30 p.m. on August 17, 2011. Timothy asked Ms. Piscola if she had spoken to the victim that day. Ms. Piscola explained to Timothy that she had last spoken to the victim during the day on August 16 and, during that conversation, the victim had told Ms. Piscola that the Defendant was helping the victim hang pictures. Timothy stated that he had been trying to reach the victim all day and was worried. After speaking with Timothy, Ms. Piscola tried to call the victim but did not get an answer. Ms. Piscola then went to the victim's residence, which was about five minutes away. She knocked on the front door several times, but the victim did not answer the door. Ms. Piscola looked in a window and saw that the lights inside the residence were out but that a television was turned on. Ms. Piscola testified that this was unusual because the victim usually had lights on inside the house due to her age. Ms. Piscola called Timothy back and said that there was "[s]omething . . . very, very wrong here" because the victim did not normally leave her home at night. Timothy asked Ms. Piscola to call 911, and police officers arrived on the scene about ten minutes later. The owner of the apartment complex gave the officers a key to the victim's residence, and Ms. Piscola entered the apartment with the officers. When one officer opened the door to the garage, Ms. Piscola saw that the victim's car was missing. Another officer then went to a bedroom in the hallway where the door to the bedroom was locked. When the officer forced open the door, he said that they needed to leave the house because "this is a homicide."

Officer Justin Smith with the Manchester Police Department testified that he was on duty on August 17, 2011, when he responded to a call for a welfare check on the victim at Ingram Place Apartments. When he arrived, Officer Smith spoke with Ms. Piscola who stated that she was good friends with the victim and that she had not heard from the victim that day, which was unusual because they spoke daily. Officer Smith went to the front and back doors and found that they were secured. When the owner of the apartment complex arrived with a key, Officer Smith and three other officers entered the victim's residence. Officer Smith saw no signs of a struggle in the living room, kitchen, garage, or hallway. He discovered, however, that the door to the last bedroom

on the right-hand side of the hallway was locked. Officer Smith used a wire coat hanger to pick the lock. When he turned on the bedroom light, Officer Smith discovered the victim's body lying in the floor. Officer Smith testified that the victim was on her back and that it was obvious that she was deceased. Officer Smith recalled that the victim had blood around her face and on her hands. After finding the victim, Officer Smith secured the scene and called his supervisor.

Special Agent Kendall Barham testified that Investigator Stewart requested that he respond to the victim's residence after the discovery of the victim's body. When he arrived, Agent Barham assisted in documenting the crime scene. In the bedroom in which the victim was found, Agent Barham saw "signs of a struggle[.]" He documented that one of the drawers to a nightstand in the bedroom had been left open and that there were reddish-brown stains on the carpeting. Agent Barham recalled that the victim had pantyhose around her neck, a laceration to the head, and a bruise on her right eye, among other injuries. Regarding the laceration to the victim's head, Agent Barham explained that he looked through the residence for a weapon that might have been used to cause the laceration but was unable to locate such an item.

Agent Barham testified that he also attended the Defendant's interview at the police department. The Defendant told officers that he had been physically sick on the day of the murder because he had not had morphine in two or three days. According to the Defendant, the victim confronted him about being a drug addict, "scolding" him and saying that he "needed to clean up[.]" The Defendant stated that he reached into one of the drawers of the chest of drawers in the bedroom and took out a pair of pantyhose. He then strangled the victim with the pantyhose. Further, the Defendant stated that, after killing the victim, he went into the bathroom until it was dark and then took some of the victim's jewelry and her car.

Agent Barham took the victim's vehicle to the TBI crime lab and requested that the car be processed. He and Investigator Stewart later photographed and inventoried bags of evidence the TBI obtained from inside the victim's car. On cross-examination, Agent Barham stated that he found other pantyhose in the chest of drawers near the victim's feet. He further stated that there were two hammers in the trunk of the victim's car which field tested negative for the presence of blood.

Investigator Billy Cook, the director of the Drug Task Force in Coffee County and a criminal investigator with the district attorney's office, testified that he retrieved the evidence from the TBI lab in Cookeville and the medical examiner's office. He also obtained DNA evidence from the Defendant. Investigator Cook was then asked a series of questions about drugs, slang used to describe drugs, and drug paraphernalia. He also identified a drug kit used to ingest drugs.

Dr. Laura Boos, a forensic scientist assigned to the serology/DNA unit at the TBI crime lab, testified as an expert in DNA analysis. Dr. Boos stated that she was asked to examine the victim's vehicle, document its contents, and test both for the presence of blood. Regarding the contents of the vehicle, Dr. Boos testified that she found jewelry in a small bag in the center console area of the car. She also found a box in the trunk that contained some jewelry. Underneath the driver's seat, Dr. Boos found a plastic bag containing a variety of coins. Beneath the front passenger seat, she discovered a silver case containing what appeared to be drug paraphernalia such as needles and spoons. She explained that her examination revealed that the interior of the vehicle tested negative for the presence of blood. Two items found inside the vehicle, however, tested positive for the presence of blood—a shirt from the backseat and a pair of pajama pants from a box in the trunk. Dr. Boos tested these items and found that they did, in fact, contain human blood. After DNA testing, the blood stain on the shirt was matched to the DNA standard of the victim. The blood stain on the pajama pants matched the Defendant's DNA.

Regina Keele testified that she was the store manager for Oak Market on Woodbury Highway. Ms. Keele was contacted by Investigator Stewart, who asked her to review footage from the market's surveillance cameras for August 16, 2011, for someone matching the Defendant's description. Ms. Keele testified that the cameras captured the Defendant entering the market at 9:13 p.m. The Defendant purchased some cigarettes and some prepaid minutes for a phone. Ms. Keele stated that it appeared from the video that the Defendant paid with some paper money and a handful of change.

Special Agent Howard Patterson, with the technical services unit of the TBI, testified as an expert in cell phone analysis. Agent Patterson stated that he analyzed the Defendant's cell phone, which investigators found in the victim's car, and reviewed text messages that were placed and reviewed by the Defendant's phone from August 15-18, 2011. One text message identified by Agent Patterson was sent to "Maggie" from the Defendant's phone on August 16, 2011 at 9:06 a.m. The message read, "Supposed to pick up eight of the 60 mg. morphs today, so going to get high as hell if I get them." A second text message was sent to "Maggie" from the Defendant's phone at 10:17 a.m. which read, "Hey, I'm ready to do some real crazy sh**, so I know how you feel. I have burnt every bridge behind me and can't change it now." At 10:21 a.m., a third text message was sent to "Maggie" from the Defendant's phone that stated, "Only thing I can say and be honest about it"; the message was followed by another text to "Maggie" at 10:25 a.m. that read, "Well, you're the only one I can and will be honest with, but don't want to worry you. Just because I think stuff doesn't mean I will do it." Later that same day, at 3:03 p.m., a text message was sent to "Maggie" from the Defendant's cell phone that said, "Hey, babe, how you doing? I am bummed out because money for morphs didn't come through for me."

At 3:35 p.m., a text was sent from the Defendant's phone to "Shann" that read, "I am at home now." Agent Patterson then read through an exchange of text messages between "Shann" and the Defendant's phone that occurred between 3:36 p.m. and 4:00 p.m. The messages read:

Defendant:   I am at my aunt's.  Can you do anything if I can get out there[?]

Shann:       Yes, I am here now.  Come on.

Defendant:   I will try.

Shann:       I need to know if you're on your way soon.  I got to do this soon or it will be too late.  I just want one point though."

Defendant:   Yes, I am coming.  Can I pull up to trailer or do it at mailbox.

Defendant:   Can't leave yet but will be soon.

Agent Patterson then read a text received by the Defendant's phone that stated the balance on his cell phone had reached zero.  Then, at 9:17 p.m., the Defendant received a message, stating that $15.00 had been posted to his cell phone account and that the balance was $15.00.

Dr. Adele Lewis, an expert in forensic pathology, testified that she performed the victim's autopsy on August 18, 2011.  The autopsy revealed that the victim had suffered blunt force trauma to her head, torso, and hands.  Dr. Lewis described the wounds to the victim's hands as defensive injuries.  She stated that the victim had lacerations to her head that were consistent with the victim "being struck with an object" from behind.  The blunt force injuries to the victim's head resulted in injuries to her brain and bleeding on the brain.  Dr. Lewis opined, however, that the wounds to the victim's head "would most likely not have been immediately fatal."  Dr. Lewis testified that the victim also had another laceration that was roughly circular in shape on the right side of the head and a cut behind her right ear.  Dr. Lewis agreed that this laceration was consistent with being caused by a hammer.  She identified "at least" six different blows to the victim's head that were not consistent with the victim falling down.  She stated that the pantyhose had been tightly wrapped around the victim's neck, causing fractures in the bones of the voice box and pinpoint hemorrhages in the victim's eyelids.  Moreover, the victim was still alive at the time she was strangled.  Dr. Lewis concluded that the cause of death was "blunt force injuries to the head and strangulation."

At the close of the State's case-in-chief, the Defendant called Shannon Young Maason. Ms. Maason testified that she was "shooting morphine" in August 2011 and that she knew the Defendant through their mutual drug use. She stated that the Defendant provided her with syringes, and she gave the Defendant pills. Ms. Maason testified that no money was ever exchanged between the Defendant and herself for the pills. Ms. Maason acknowledged that, on August 16, 2011, she exchanged several text messages with the Defendant regarding "getting morphine and doing the exchange." Ms. Maason testified that the Defendant came to her house in Cannon County sometime later, and she gave him drugs. Ms. Maason could not recall what time the exchange took place but stated that the Defendant appeared to be "on foot." She denied that money was exchanged and said that she never traded with the Defendant for drugs after that date. On cross-examination, Ms. Maason stated that she was "Shann," who was referred to in the text messages read by Agent Patterson.

Ricky Duke testified that, in the summer of 2011, the Defendant had stayed with him for about ten days. During that time, the Defendant did some mechanical work on Mr. Duke's farm. Although Mr. Duke did not know the victim, he identified her car and stated that he had seen the Defendant driving the victim's car on two occasions that summer. The first time the Defendant drove to Mr. Duke's residence in the car, there was a woman in the car with the Defendant. The following day, the Defendant arrived at Mr. Duke's residence in the victim's car by himself. Mr. Duke recalled that the Defendant got to his house around 6:00 or 6:30 a.m. and they worked on a four-wheeler that day. At one point, Mr. Duke and the Defendant went to McMinnville in Mr. Duke's car to get a part for a car. When they returned, the Defendant said he would see Mr. Duke the following day and left. The next morning, Mr. Duke learned through a news report that police were looking for the Defendant.

Based upon this proof, the jury found the Defendant guilty as charged in the indictment. After a sentencing hearing, the jury sentenced the Defendant to life without parole for first-degree felony murder and first-degree premeditated murder,[3] finding beyond a reasonable doubt the aggravating factors that the murder was especially heinous, atrocious, or cruel and that the victim of the murder was seventy years of age or older. See Tenn. Code Ann. § 39-13-204(i)(5), (14). The trial court sentenced the Defendant, as a Range III career offender, to twelve years for theft over $1,000 and, as a Range I standard offender, to twenty-five years for especially aggravated robbery. The court ordered all sentences to run concurrently. The Defendant subsequently filed a

---

[3] The trial court merged the guilty verdict for first-degree premeditated murder into the conviction for first-degree felony murder.

- 12 -

timely motion for new trial, which was denied by the trial court. This timely appeal followed.

## II. Analysis

## A. Sufficiency of the Evidence

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

### 1. First Degree Felony Murder and Theft over $1,000

The Defendant contends that the evidence presented at trial is insufficient to support his conviction for first degree felony murder. The Defendant contends that the killing and the predicate felony were not closely connected in time, place, causation, and continuity of action. See State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). The Defendant asserts that the victim's murder occurred first and then he spent a long time in the bathroom crying such that there was "a break in the chain of events between the killing of the victim and the leaving of the defendant and the taking of the car, jewelry, and coins."

As charged in this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2010). A theft of property occurs when someone, with the intent

- 13 -

to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103(a) (Supp. 2011).

In this case, there is no dispute that both the theft and the killing occurred in the same place, *i.e.*, the victim's apartment. Moreover, the evidence showed that, after the killing, the Defendant took the victim's jewelry and coin collection from inside the apartment and cash out of the victim's wallet. He then fled the scene, taking the victim's car, and the proof established that the value of the items taken by the Defendant was over $1,000. The State offered into evidence the Defendant's text messages, which showed that at 3:00 p.m. on the day of the murder, the Defendant complained to a friend that the "money for morphs didn't come through for [him]." Then, over the next hour, the Defendant sent Ms. Maason a series of text messages, in which the Defendant stated that he was at the victim's apartment but that he wanted to go see Ms. Maason in Cannon County to complete a drug deal. Additionally, Ms. Maason testified that, sometime later that evening, the Defendant showed up at her house and she gave him some pills. Under these circumstances, the jury could reasonably infer that the killing and theft were part of a continuous course of action and not isolated events. The Defendant is not entitled to relief.

## 2. First Degree Premeditated Murder

Next, the Defendant contends that the evidence was insufficient to support his conviction for first degree premeditated murder. He asserts that the victim's act of slapping him while he was withdrawing from drugs and his immediate response of strangling the victim "indicate there was a period of excitement and passion . . . not at all indicative of the 'exercise of reflection and judgment'" and that the evidence established only that he was guilty of second degree murder.

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2010). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2010). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. Premeditation "may be established by proof of the circumstances surrounding the killing." State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was

particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id. The element of premeditation is a question of fact to be determined by the jury. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The evidence at trial showed that the Defendant repeatedly battered the victim—an unarmed, 81-year-old woman—in the head with an object and used pantyhose that he obtained from a dresser drawer to strangle her to death. The subsequent autopsy revealed that the victim's cause of death was both blunt force injuries to the head and strangulation. Dr. Lewis testified that the Defendant hit the victim at least six different times in the head and that he wrapped the pantyhose so tightly around the victim's neck that bones in her throat were fractured. After the assault, the Defendant did not attempt to call for aid for the victim. Rather, the Defendant collected cash, jewelry, and coins from the victim's house and stole her car. He then obtained pills from Ms. Maason in Cannon County and purchased cigarettes and additional minutes for his phone at a market. Additionally, on the morning of the murder, the Defendant sent a text message to "Maggie" which read, "Hey, I'm ready to do some real crazy sh\*\*, so I know how you feel. I have burnt every bridge behind me and can't change it now." Based upon this evidence, we conclude that the jury could reasonably find that the Defendant's killing of the victim was a premeditated and deliberate act and that the Defendant was sufficiently free from excitement and passion when he decided to kill the victim.

### 3. Especially Aggravated Robbery

The Defendant also contends that the evidence at trial was insufficient to sustain his conviction for especially aggravated robbery. Specifically, he argues that he did not "hurt or kill the victim to steal from her but as a result of their heated exchange regarding his drug use" and that the theft occurred after the argument and subsequent killing.

Especially aggravated robbery is defined as a robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). A "deadly weapon" includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5) (Supp. 2011). "Serious bodily injury" is a bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone

of a child who is eight years of age or under.  Tenn. Code Ann. § 39-11-106(a)(34) (Supp. 2011).

Once again, we conclude that the evidence is sufficient to support the Defendant's conviction.  The Defendant used an object consistent with a hammer to cause severe lacerations and trauma to the victim's head, and he used pantyhose to strangle the victim.  Both items, in the manner in which they were used, were capable of causing death or serious bodily injury, and Dr. Lewis testified that the victim died as a result of blunt force trauma to the head and strangulation.  Furthermore, after killing the victim, the Defendant collected cash, coins, and jewelry from her home and took the victim's car.  Based upon the jury's verdict, it is clear that the jury rejected the Defendant's version of events and instead accepted the State's contention that the Defendant assaulted and killed the victim for the purpose of stealing her personal possessions.  This court will not reweigh the evidence.  Bland, 958 S.W.2d at 659.  The Defendant is not entitled to relief.

## B. Motion for Mistrial

The Defendant asserts that the trial court erred by denying his motion for mistrial after Officer Smith testified that Ms. Piscola told him the Defendant "had recently been released from prison."  The Defendant argues that Officer Smith's testimony was in direct violation of the trial court's pretrial ruling that the State may not introduce evidence of the Defendant's prior convictions.  The State responds that the trial court properly exercised its discretion when it chose to give a curative instruction and that the Defendant has failed to demonstrate on appeal how a mistrial was a "manifest necessity" under the circumstances.  We agree with the State.

The decision of whether to grant a mistrial is within the sound discretion of the trial court.  State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996).  Normally, a mistrial should be declared only in the event that a manifest necessity requires such action.  State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).  "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did."  State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000).  The burden to show the necessity for a mistrial falls upon the party seeking the mistrial.  Id.  This court will not disturb the trial court's decision unless there is an abuse of discretion.  State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990).  In evaluating whether the trial court abused its discretion, we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof."  State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

- 16 -

Before trial, the Defendant filed a motion in limine, requesting that the State be directed not to mention the Defendant's prior convictions or prior bad acts during voir dire, opening statements, or through its questioning of witnesses. Following a hearing on the motion, the trial court granted the motion after the State agreed that it would advise its witnesses not to speak of the Defendant's criminal history or prior bad acts.

However, in response to an open-ended question regarding what led him to the victim's apartment, Officer Smith testified that, while he and Ms. Piscola were waiting for the owner of the victim's apartment to arrive with a key to the residence, Ms. Piscola told him that the Defendant had been staying at the residence and that the Defendant had "recently been released from prison." The Defendant objected, and the trial court conducted a hearing outside the presence of the jury during which the Defendant argued that Officer Smith's testimony was hearsay and in violation of the court's ruling on his motion in limine. Additionally, the Defendant argued that Officer Smith's statement was not true because the Defendant had been released from prison in 2002—nine years before the victim's murder. The State requested that the trial court strike the officer's comment and instruct the jury not to consider it. The defense then requested that the trial court provide an additional instruction that the statement was not accurate, a request to which the State did not object. The trial court stated that it would so instruct the jury but noted that it was time for the jury to take a lunch break. The court recessed for lunch for about an hour.

Following the lunch recess, the Defendant requested a mistrial, arguing that the statement was hearsay, in violation of the court's order on the motion in limine, and was highly prejudicial to the Defendant. The State responded that a mistrial should only be granted when there was no feasible alternative to halting the proceedings, that the comment was inadvertent and not true, and that the trial court could tell the jury that the parties stipulated it was not true. The trial court agreed with the State and denied the Defendant's motion for mistrial. When the jury returned to the courtroom, the trial court provided the following instruction:

> Right before we took our lunch recess, the defense had objected to a statement . . . made to [Officer Smith] by Ms. Piscola concerning the [D]efendant being recently in prison.
>
> I am going to instruct you that that statement is false, is a false statement. Both the State of Tennessee, the attorneys for the State and the attorneys for the defense stipulate that it is a false statement.
>
> So it is one of those—and I have ruled that it is inadmissible because it is not relevant in this case, so I want you to wipe your minds clean, erase

- 17 -

the slate as if you never heard that statement, and do not let it affect in any way your decision in this case. It is stipulated to be false and I have instructed it's hearsay, for one thing, but it is a false statement. Okay.

Upon review, we conclude that the trial court did not abuse its discretion when it denied the Defendant's motion for mistrial. Because Officer Smith's comment was not responsive to the State's question, we cannot say that the State elicited the testimony. Moreover, the trial court gave a curative instruction, telling the jury that Ms. Piscola's comment that the Defendant had been in prison recently was false and that the parties both agreed that the statement was false. The court instructed jurors not to consider the statement or let it have any effect on their decision in the case, and the jury is presumed to have followed those instructions. Finally, the proof of the Defendant's guilt was strong, and the Defendant has pointed to nothing in the record indicating that a mistrial, rather than the curative remedies fashioned by the trial court, was a "manifest necessity." This issue is without merit.

### C. Motion to Suppress Statement

Finally, the Defendant contends that the trial court erred in denying the motion to suppress his statement to police. The Defendant argues that, because he had "shot up morphine earlier that day," the voluntariness of his statement was "in question" and "should have been more thoroughly explored by the investigators at the time of the arrest and the interview[.]" The State responds that the record supports the trial court's ruling that the Defendant "was by all proof not impaired" at the time he spoke with the police and the Defendant is not entitled to relief. We agree with the State.

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. Id. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. Id. We review the trial court's conclusions of law de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005). In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, this court may consider the proof adduced both at the suppression hearing and at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled

to give evidence against himself." Tenn. Const. art. I, § 9. The test of voluntariness for confessions under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment. State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

The voluntariness of a confession is a question of fact. State v. Sanders, 452 S.W.3d 300, 306 (Tenn. 2014) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000); State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996); Self v. State, 65 Tenn. 244, 253 (1873)). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. Id. (citing State v. Stamper, 863 S.W.2d 404, 405 (Tenn. 1993)).

A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)). Circumstances relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting People v. Cipriano, 429 N.W.2d 781 (Mich. 1988)) (emphasis omitted).

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." Climer, 400 S.W.3d at 568 (citing Dickerson, 530 U.S. 428 at 433-35; Smith, 933 S.W.2d at 455). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. Smith, 933 S.W.2d at 455 (citing State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" Brimmer, 876 S.W.2d at 79.

In denying the Defendant's motion to suppress, the trial court found that the Defendant was "by all proof not impaired" at the time he gave his statement to police. The testimony from the suppression hearing supports the trial court's conclusion. Investigator Stewart, Chief Yother, and Investigator Butler all testified that the Defendant was coherent and appeared sober at the time of his arrest and when the Defendant gave his statement. The Defendant was able to walk backwards towards Investigator Stewart's voice without stumbling and engage with the officers in appropriate conversation, and he provided the officers directions back to the main road. After he was advised of his <u>Miranda</u> rights, the Defendant stated that he understood his rights and knew why officers were arresting him. The Defendant also gave a detailed, "cogent narrative" of the events surrounding the murder, and he appropriately expressed remorse. These facts directly contradict the Defendant's claim that he was too sick or too intoxicated to make a voluntary statement to police. We conclude that the facts support the trial court's conclusion that the Defendant's statement was voluntary. The Defendant is not entitled to relief on this issue.

### III. <u>Conclusion</u>

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE