IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 19, 2018

**STATE OF TENNESSEE v. RANDY LOUIS ROE**

**Appeal from the Criminal Court for Sumner County**
**No. 2014-CR-940    Dee David Gay, Judge**

_____

**No. M2017-01886-CCA-R3-CD**

_____

A jury convicted the Defendant, Randy Louis Roe, of three counts of rape of a child, one count of especially aggravated sexual exploitation of a minor, two counts of sexual exploitation of a minor, and one count of solicitation to commit rape of a child. He received an effective sentence of thirty-five years in prison. A few days prior to trial, the State alerted the Defendant to the existence of voluminous documents consisting of emails between the Defendant and the victim which had not previously been produced in discovery. The Defendant sought a continuance. The trial court denied the continuance but ruled that the new materials would not be admissible unless the Defendant "opened the door" during his testimony. On appeal, the Defendant seeks a new trial based on the trial court's ruling on the admissibility of the emails. After a thorough review of the record, we discern no error and affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Matthew Edwards (on appeal) and John Harding (at trial), Hendersonville, Tennessee, for the appellant, Randy Louis Roe.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; L. Ray Whitley, District Attorney General; and Tara Wiley and Sydney Preston, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The victim, who was twelve years old at the time of the crimes, was placed into foster care in the Defendant's home, along with two of her siblings. The Defendant raped the victim while she was in his home as his foster child. He also set up an email account for her, and he sent, asked for, and received various explicit messages after the victim had been removed from his home. When the victim's new foster parents became aware of the emails, they changed her email password and turned the new password and other materials over to police. Detective Ron Brawner of the Sumner County Sheriff's Office then provided the prosecutor with numerous printed emails and with copies of various incriminating images and voice recordings attached to the emails.

Trial was scheduled to begin on Monday, August 15, 2016. According to the prosecutor, on the Tuesday before trial, she noticed that only one printed email showed a voice recording as an attachment, whereas she had received several voice recording files from the Sumner County Sheriff's Office. Suspecting that there were additional emails that were missing from the file, she requested Detective Brawner to meet with her and bring the password to the victim's email account so that she could inspect the emails. Although Detective Brawner told her he believed he had printed all the emails, the prosecutor discovered that there were hundreds of pages of emails that had not been printed. The prosecutor noted that law enforcement had printed "the worst of" the emails.

On the Thursday before trial, defense counsel and an Assistant District Attorney General spent several hours looking through the emails and attempting to identify the ones that had not been previously produced. The appellate record shows that there were over four hundred pages of previously unproduced emails. The bulk of these pages, however, consisted of email "threads" with numerous lines of previously produced content topped with one or two lines of previously unproduced responses. Defense counsel was not provided with the attachments associated with the new emails until Friday afternoon.

The defense sought a continuance. The trial court declined to reschedule the trial but determined that, although the trial would begin as scheduled on Monday, there would be a recess until noon the following day to give the defense extra time to evaluate the late-provided discovery. The court also ordered that the new evidence would not be admissible as part of the prosecution's case-in-chief. Defense counsel noted, "I did find something that … I believe may have some exculpatory value in this new evidence." The trial court ruled that any exculpatory material contained in the new discovery would be

admissible and instructed the prosecution to inform the defense of anything exculpatory it discovered. The court further determined that the new material could be used on cross-examination only if the Defendant "opened the door" through his testimony.

At trial, the victim's mother testified that in February 2014, the twelve-year-old victim, her eleven-year-old sister, and her ten-year-old brother were placed in government custody. A court had ordered the victim's mother to prevent contact between her boyfriend and her children. When it was discovered that she had moved with the children to Texas in order to circumvent the order, her children were removed from her custody and temporarily housed in Texas. They were placed into foster care in Tennessee with the Defendant and his wife in March 2014.

At the Defendant's home, the victim and her sister shared a bed in an upstairs bedroom. The Defendant's adult son slept across the hall, and the Defendant and his wife slept in a nearby bedroom. The victim's brother and another foster child slept downstairs. On the victim's first night in the home, she awoke to find the Defendant staring at her while she slept. She testified that he subsequently touched her vagina while they were alone in the sunroom.

The victim testified that the Defendant assaulted her on several occasions at night while his wife was at work. She stated that "multiple" times, while her sister was asleep next to her in her bedroom, the Defendant's tongue touched her vagina. She also testified that the Defendant put his penis into her vagina "[s]everal times." She testified that on at least four nights when the Defendant's wife was at work, the Defendant had sexual contact with her. On one occasion, her sister was not in the room.

The victim's sister confirmed that the Defendant would "say he needed to talk to my sister a lot" and that the two were alone behind the closed door of the sunroom. One night, the victim's sister woke up to hear whispering and saw the Defendant and the victim in the room. The victim told her sister to go back to sleep, but the victim's sister woke up again and saw the Defendant on the bed, with the crying victim in his arms. She did not reveal this incident in a forensic interview because she did not know the purpose of the interview and did not think the incident was important. The victim's sister testified that she was uncomfortable with the Defendant's hugging and kissing. The victim's mother confirmed that the victim's sister told her that the Defendant's excessive hugging made her uncomfortable, but the victim's mother's numerous attempts to address the issue through various authorities yielded no results.

The children were ultimately removed from the home in June, approximately three months after their arrival, in connection with some violent behavior exhibited by the victim's younger brother. In an attempt to keep the siblings together, they were placed in

the home of Sandra and Ted Kearney. Mr. and Ms. Kearney both testified that the victim was "obsessed" with the Defendant and that she continually talked about him. Mr. Kearney also testified that the victim was "more sexually aware" than he would expect a child who had not been exposed to a sexual relationship to be.

Several witnesses testified regarding the Defendant's interest in the victim after her removal from the home. Ms. Kearney testified that the Defendant called Ms. Kearney several times in one day, and when she spoke to him, he stated that he wanted to adopt the victim, although he did not want to adopt the victim's siblings. Ms. Karen Smith of the Department of Children's Services testified that the Defendant was still asking about the victim on August 18, 2014, during a home visit related to another child, and she recommended a training program called "loving and letting go." Ms. Connie Meneese, a volunteer with Court Appointed Special Advocates, testified that she was concerned with the victim's behavior during a meeting at the Defendant's home because the victim was "sitting way too close" to the Defendant. When the children were removed, the Defendant called Ms. Meneese several times regarding adopting the victim and her sister. Mr. Rodney Compton, a family service worker at the Department of Children's Services, testified that the children were removed because of problems with the victim's brother and that after the removal, the Defendant "[w]anted constant information on" the victim. He acknowledged that the Defendant and his wife had been "good foster parents" who frequently took children who were otherwise difficult to place.

The victim testified that the Defendant gave her a telephone and set up an email account for her and that the two communicated through email, Facebook, and a "calling app" after she and her siblings were removed from the home. The victim authenticated multiple electronic communications that she exchanged with the Defendant. The victim's school counselor and Ms. Smith confirmed that the Defendant's email address used in the communications with the victim was the same email address that the Defendant had listed on the school contact form and on his foster parent resource home cover sheet.

The Defendant sent the victim multiple pictures of himself, including multiple pictures of his penis, pictures of himself sticking out his tongue, and pictures of himself in bed and shirtless. The Defendant sent multiple messages instructing the victim to delete the communications between them. He also sent messages which the victim testified were requests for nude photographs of her. The victim sent the Defendant nude photographs of herself in response.

The Defendant's incriminating emails included the following statements, which have not been altered for spelling or clarity:

- 4 -

- "it's a shame you didn't get the voice recording it was hot and steamy you know the pictures of you of the bed I would like to have one like that but all lots more detail"
- "I hope you're getting my voice recordings at the pictures I've got 1 I'm a little scared but I send it I love you if i if I send it you gotta get rid of it"
- "you need to erase everything off your phone case they take it"
- "suck this." This statement accompanied a picture of the Defendant's penis.
- "you know if anybody find surf I will go to jail"
- "send me 1 spread open close up you need to delete all messages"
- "I wish we could run off together somewhere"
- "I need a good close up"
- "you make a sound like you're breaking up with me"

Some of the Defendant's emails to the victim included incriminating voice recordings as attachments. The victim testified that she believed she had contracted a sexually transmitted disease ("STD") from the Defendant and that the Defendant and his wife did not take her for treatment while she lived with them. One of the Defendant's recordings stated, "And I hope you get over your STD. I don't have one. Of course, I was wearing…Make sure you erase this. I love you." The Defendant also expressed concern about his criminal conduct, stating, "It might scare me to death because of how old you are, and I really don't want to go to jail." In the voice recordings, the Defendant expressed his desire to touch the victim "all over your body" and to perform cunnilingus on her. He referenced touching the victim's breasts and having sexual intercourse with her.

The victim told Mr. Kearney about the abuse in September 2014. She gave her email password to Mr. Kearney, and he looked at her email to confirm that the Defendant engaged in inappropriate communications with her. Mr. Kearney changed the victim's email password and gave the police the new password and the victim's Facebook information.

The victim went for a forensic interview, but she testified at trial that she "lied quite a bit" in the interview because she expected to be "in trouble." In her forensic interview, the victim expressed trepidation about being adjudicated delinquent as a result of having had sexual contact with the Defendant. The victim was reluctant to speak but wrote, "We kind of had sex," on a piece of paper. She explained during the interview that the Defendant "didn't fully inject me. He tried to and I told him no." The victim stated that the Defendant kissed her genital area on multiple occasions and tried to penetrate her vaginally but did not penetrate her. She told the interviewer that on one occasion when the Defendant performed cunnilingus, her sister was not there, but on

several occasions, her sister was asleep in the bed. The victim described the electronic communications she exchanged with the Defendant. At trial, the victim testified that by "inject," she meant "ejaculate."

The victim acknowledged that, while she lived with the Kearneys, she had written the Defendant a letter which stated, "You've never tried molesting me." She explained that she wrote the letter hoping that the Kearneys would find it, because she was worried that the Kearneys were suspicious about her relationship with the Defendant.

The victim and her mother both acknowledged that the victim had previously falsely accused the victim's mother's boyfriend of molesting her. The victim explained that her mother's boyfriend was innocent and that the accusation had been an attempt to bring attention to her relationship with the Defendant. She stated that she made the accusation while she was living with the Defendant and "couldn't talk to my mom without someone standing over my shoulder." The victim's mother denied that her boyfriend had touched the victim inappropriately, and both the victim and her mother stated that the victim had never been sexually assaulted prior to her placement in the Defendant's home. Although the victim never testified against her mother's boyfriend, she was scheduled to do so, and one of the Defendant's emails to her stated, "I'm glad you're not testifying against me."

The victim also acknowledged that she had told two medical providers that in December 2013, she had engaged in consensual sex with a thirteen-year-old boy. At trial, she testified that she had not had intercourse prior to being raped by the Defendant and that she made the statements because she was embarrassed by the fact that the Defendant had had sexual contact with her.

After revealing the abuse, the victim was examined by Ms. Hollye Gallion, a pediatric nurse practitioner. Ms. Gallion testified that she would not expect to find any physical evidence of a rape that had occurred months prior to the exam and that the victim's exam was "normal." The victim believed that she had contracted a sexually transmitted disease from the Defendant. Ms. Gallion testified that the victim's medical records indicated that she was diagnosed in late June with a bacterial infection, which would be more common in sexually active women but could also occur in children who were not sexually abused.

After the victim revealed the abuse, law enforcement arrested the Defendant and obtained a search warrant for his home. Among other items, the Defendant's cellular telephone, a laptop computer, and a USB drive were seized. Special Agent Chet Mason retrieved two images from the laptop, both of which were photographs of the victim nude. He testified that these images were the same as some of the images contained on

the Defendant's telephone and that someone would have had to have taken an affirmative action to transfer the images onto the laptop. The USB drive also contained multiple images of the victim nude which matched the emailed images. Special Agent Mason again testified that the images would have had to be extracted onto a computer and then saved onto the USB drive.

Detective Brawner investigated the offenses and interviewed the Defendant after his arrest. He testified that the Defendant declined to make a statement but subsequently volunteered that the victim had sent him images, that he had deleted them, and that he had not had sexual intercourse with her.

The Defendant presented the testimony of the Defendant's adult son, who stated that he lived in the home at the time the victim and her siblings were there. The Defendant's son recalled that numerous other people were living at the home, including the Defendant and his wife, another foster child and her small son, and the Defendant's two grandchildren on the days that the Defendant's son had custody of them. The Defendant's son testified that the downstairs bathroom was not functioning and that the entire family was sharing the one upstairs bathroom which was close to the room the victim and her sister shared. The Defendant's son slept across the hall from the victim and her sister, and he kept his door open all night. The Defendant's son testified that the doors in the house were hung low and made a noise when they were opened or closed as they swept across the carpet. He also testified that the doors were old and the latches "popped a little bit when you latched it." He did not see or hear anything inappropriate happen between the Defendant and the victim or any other foster child. He testified that his parents first became foster parents when he was eight years old. They ultimately adopted their first foster daughter. The Defendant and his wife had fostered approximately twenty-five children, and the Defendant had never before been accused of sexual impropriety.

The Defendant's wife testified that approximately thirty to forty foster children had been placed in their home and that no prior allegations of sexual misconduct had surfaced against the Defendant. She testified that she never saw the Defendant do anything inappropriate. She also stated that she took the victim to the doctor twice while the victim was in her home.

The State elected to base the first count of rape of a child on an act of cunnilingus, the second on penile penetration that occurred while the victim's sister was in the bed, and the third on penile penetration that occurred while the victim's sister was not in the bed. The basis for the especially aggravated sexual exploitation of a minor charge was one of the emails instructing the victim to send a picture of her vagina, and the two sexual exploitation of a minor charges were based on the Defendant's possession of one nude

photograph of the victim and one photograph of the victim's vagina. The solicitation for rape of a child charge was based on the email stating, "suck this," and attaching a photograph of the Defendant's penis.

The jury convicted the Defendant on all counts. The trial court sentenced the Defendant to thirty-five years for each count of rape of a child, ten years for the solicitation conviction, ten years for the conviction for especially aggravated sexual exploitation of a minor, and three years for each conviction for sexual exploitation of a minor. The sentences were ordered to be served concurrently for an effective sentence of thirty-five years.

The Defendant moved for a new trial on the basis that the trial court erred in denying a continuance and ruling that the late-produced emails would be admissible should the Defendant "open the door." The Defendant argued that two of the numerous emails could have been used to support the "possible defense theory" that the sexual relationship between the Defendant and the victim was "sexting" and "fantasy" rather than actual physical contact.

The prosecutor created a meticulously documented exhibit which included all of the emails, with new material highlighted. The email regarding "sexting" referenced by defense counsel was sent by the victim to the Defendant and reads: "This Is sapost to be funny but I have an idea. :) get this phone fixed and we can sex t lol or you can masterbait. Trust me its fun lol love you." The second relevant email from the victim to the Defendant declares, "I think I'll sleep all day and dream about fantasy sx life lol love you do you love me daddy." The other emails in the late-produced discovery contain numerous incriminating messages sent by the Defendant to the victim. The victim and Defendant exchange several emails regarding her belief that she has a sexually transmitted disease, with the Defendant asking her repeatedly what kind of infection she has. He then writes, "I did get checked out & I don't." In response to the victim's inquiry regarding what he would do if she were pregnant, the Defendant responds, "I wouldn't let that happen to you because I love you that doesn't have to happen but I'd probably be dead." The Defendant sends several emails instructing the victim to delete their communications and expressing fear that the communications will be discovered. In one email, he describes the victim as "sexy" and references kissing her lips and touching her breasts. The trial court found that the new material contained "absolutely nothing exculpatory" and denied the motion for a new trial.

## ANALYSIS

On appeal, the Defendant asserts that the trial court erred in its resolution of the dispute regarding the late-produced emails. The Defendant premises relief on the

prosecutor's duty to disclose exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and on the State's discovery obligations under Tennessee Rule of Criminal Procedure 16. The State responds that the Defendant has failed to establish the elements of a *Brady* claim and that the trial court did not abuse its discretion in remedying the late production of evidence by excluding the evidence from the State's case-in-chief.

## I. Failure to Disclose Exculpatory Material

The Defendant argues that the late production of the additional emails amounted to the suppression of exculpatory evidence. The suppression of evidence favorable to the accused is a due process violation when the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the evidence or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the evidence that was suppressed was favorable to the accused; and (4) the evidence meets the standard of materiality. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). The defendant has the burden of proving a violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995). We conclude that the Defendant has failed to demonstrate that the evidence was exculpatory, that it was suppressed by the State, or that it was material.

First, while the Defendant strains to put a favorable construction on the late-produced evidence, the record supports the trial court's finding that the evidence was inculpatory. The State's *Brady* obligations reach all "favorable information," regardless of its admissibility. *Jordan v. State*, 343 S.W.3d 84, 96 (Tenn. Crim. App. 2011). "Information that is favorable to the accused may consist of evidence that 'could exonerate the accused, corroborate[] the accused's position in asserting his innocence, or [contain] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding'" a potential defense. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001) (quoting *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)). Evidence which permits the defense to impugn the reliability of the State's investigation, impeach the credibility of witnesses, or bolster the defense's position amounts to favorable evidence. *Jordan*, 343 S.W.3d at 96. Here, the emails overall strengthen the inference, which could already be drawn from the prior electronic communications, that the Defendant engaged in sexual conduct with the victim. The Defendant's inculpatory responses to the victim's concerns about pregnancy and a sexually transmitted disease are particularly damning. We presume that the Defendant's *Brady* claim concerns only the two emails cited by the defense. Although these emails do not refer to a physical relationship, neither do they support the inference that the relationship between the victim and the Defendant existed only in the ether. Instead, they

primarily show that the communications between the victim and Defendant were extremely inappropriate and of a sexual nature. We conclude that the late-produced evidence was not favorable to the Defendant.

Furthermore, the Defendant has not demonstrated that the State suppressed evidence in its possession. The rule in *Brady* applies "not only to evidence in the prosecution's possession, but also to 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Jackson*, 444 S.W.3d at 594 (quoting *Strickler v. Greene,* 527 U.S. 263, 275 n.12 (1999)). This includes "evidence in police possession which is not turned over to the prosecution." *Id.*; *see Wearry v. Cain*, 136 S. Ct. 1002, 1007 n.8 (2016) (noting that an inmate's statement made during trial to police required disclosure even if it was not known to the prosecutor). Accordingly, awareness of the late-produced emails, which were accessible to Detective Brawner, is imputed to the prosecutor.

However, under *Brady*, the prosecution is not under a duty to disclose information that the accused either possesses or is able to obtain. *Johnson*, 38 S.W.3d at 56; *State v. Caldwell*, 656 S.W.2d 894, 896 (Tenn. Crim. App. 1983) (declining to find a *Brady* violation in failing to turn over police records where the defendant was aware of the content of the witness's testimony). The emails in question were either sent or received by the Defendant. Accordingly, the Defendant presumably knew of their existence and was aware that he was profiting by the prosecution's initial failure to discover the emails. At no time did the Defendant introduce any evidence that these two allegedly exculpatory emails had been deleted or were otherwise unavailable to him through his own email account. The Defendant accordingly failed to establish by a preponderance of the evidence that the evidence was otherwise unavailable to him. *See State v. Leon Davis*, No. 03C01-9307-CR-00239, 1995 WL 105328, at *3 (Tenn. Crim. App. Mar. 14, 1995) (concluding there was no *Brady* violation when the defendant did not establish why he could not have subpoenaed the relevant information prior to trial).

Moreover, there is no suppression when the material is disclosed in time for the defendant to use it effectively at trial. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (finding no *Brady* violation where the material was disclosed at trial and the defendant refused an opportunity to postpone the trial). "Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting). Here, defense counsel was provided with over four hundred pages of emails on the Thursday prior to trial, and he spent approximately six hours reviewing them with the prosecutor on that day. The bulk of the pages contained previously produced content

and a previously unproduced reply at the top of the email "thread." For the motion for a new trial hearing, the prosecutor created an exhibit which consisted of only the previously unproduced replies, and this exhibit was a little over twenty pages. Counsel told the trial court on the morning of trial that he "did find something that … [he believed might] have some exculpatory value in this new evidence." The trial court then specifically ruled that anything exculpatory would be admitted at trial and held the trial in abeyance the following morning to provide more time to review the discovery. The Defendant did not introduce the two emails, which illustrated a sexual relationship between the victim and Defendant, at trial. The defense posited at the time of the motion for a new trial that the two emails in question might have supported the inference that the Defendant's relationship with the victim was virtual only, but the Defendant did not allege that he did not discover these emails prior to trial due to the late production of the discovery. Accordingly, we conclude that the Defendant did not establish that the material was not disclosed in time for him to use it effectively at trial.

Neither does the evidence meet the standard of materiality. Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A violation is established "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Here, the two emails only bolster the State's proof that the Defendant committed the offenses against the victim. Accordingly, the Defendant has not established that he is entitled to relief under *Brady*.

## II. Tennessee Rule of Criminal Procedure 16

The Defendant asserts that the State violated its discovery obligations under Tennessee Rule of Criminal Procedure 16. He argues that he was denied his preferred remedy – a continuance – in error. The State responds that the trial court did not abuse its discretion in excluding the evidence from the State's case-in-chief rather than granting the continuance.

The Defendant contends that under Tennessee Rule of Criminal Procedure 16(a)(1)(B)(i) and 16(a)(1)(F), the State was obligated to disclose the emails. The State does not dispute that the items were subject to discovery, but instead asserts that the trial court granted the Defendant a proper remedy for the delayed production of the documents. Under Tennessee Rule of Criminal Procedure 16:

- 11 -

If a party fails to comply with this rule, the court may:

    (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

    (B) grant a continuance;

    (C) prohibit the party from introducing the undisclosed evidence; or

    (D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). The "open[]-ended" language of the Rule provides for a variety of sanctions, including dismissal of the indictment. *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008). "A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case." *Id.* (citing *State v. Collins*, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000)). Accordingly, the trial court should fashion relief which is effective and appropriate. *Collins*, 35 S.W.3d at 585. Any prejudice accruing to the accused is a factor in determining what remedy is appropriate. *State v. Giles*, 493 S.W.3d 504, 521 (Tenn. Crim. App. 2016). The trial court may choose to exclude evidence which was not disclosed, but "[e]xclusion of evidence is a 'drastic remedy and should not be implemented unless there is no other reasonable alternative.'" *State v. Gann*, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007) (quoting *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995)).

Here, finding that the late production of the discovery hampered the Defendant's ability to prepare for a trial in which the materials would be introduced, the trial court granted the "'drastic remedy'" of excluding the emails. *Gann*, 251 S.W.3d at 457 (quoting *Smith*, 926 S.W.2d at 270). The trial court also granted additional time to review the materials, ordering a recess for the morning of the second day of trial. The trial court ruled that any exculpatory emails discovered in the newly produced materials would be admissible. The Defendant wisely chose not to introduce any of the new emails, which were uniformly inculpatory.

The Defendant argues that because his review of the materials was hurried, he was hesitant to exercise his right to testify, fearing that the new materials would come in to rebut his testimony. However, had the trial court granted the Defendant's chosen remedy of a continuance, all of the materials would have been admissible. The new emails contained material that was inculpatory, including the Defendant's responses to the victim's worries over an STD and pregnancy.

The Defendant contends that the trial court erred in ruling that the materials would come in if the Defendant should "open the door" during his testimony. "'[O]pening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). In order to "open the door," the party against whom the evidence is offered must introduce the matter or put the matter at issue. *Id.* The evidence which is admitted must be relevant to the same subject matter as the evidence introduced by the party against whom it is offered. *Id.* at 247 (holding that introducing evidence that the defendant was not violent toward the witness's daughter did not open the door to evidence that he was violent toward the witness); *State v. Riels*, 216 S.W.3d 737, 746 (Tenn. 2007) (holding that statement of remorse did not open the door to cross-examination regarding the details of the murders). The Defendant cites to no particular evidence that would have been admitted had he testified, and he cites to no authority questioning the validity of the equitable principle of "opening the door" in Tennessee. Accordingly, we cannot conclude that the trial court erred in informing the Defendant that if he chose to present testimony which was at odds with the evidence, the evidence would become admissible.

We conclude that the trial court did not abuse its discretion in crafting a remedy for the late production of the emails by excluding them from the State's case-in-chief, allowing a recess for review of the emails, and ruling admissible only materials which would be exculpatory or responsive to any testimony which might "open the door" to further proof. The Defendant is not entitled to relief

**CONCLUSION**

Because the Defendant has not shown that the State improperly withheld exculpatory material or that the trial court abused its discretion in fashioning a remedy for late-produced discovery, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE