IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2019 Session

## STATE OF TENNESSEE v. JOSEPH MARQUIS JEFFRIES

**Appeal from the Circuit Court for Williamson County**
**No. II-CR-170365   James G. Martin, III, Judge**

_____

### No. M2018-00625-CCA-R3-CD

_____

A jury convicted the Defendant, Joseph Marquis Jeffries, of two counts of aggravated assault, two counts of reckless endangerment, domestic assault, interference with emergency communications, trafficking for a commercial sex act, and promotion of prostitution. The trial court merged various offenses and imposed an aggregate sentence of twenty-five years. The Defendant asserts that the trial court erred in not severing the sexual offenses from the assaultive offenses and that the trial court erred in allowing evidence of prior bad acts. We conclude that the offenses were properly joined and that there was no error in the admission of evidence, and we accordingly affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Vanessa Pettigrew Bryan, District Public Defender, and J. Gregory Burlison (at trial and on appeal) and Chelsea Curtis (at trial), Assistant District Public Defenders, and Patrick T. McNally (on reply brief), for the appellant, Joseph Marquis Jeffries.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Kelly Lawrence, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was arrested after he assaulted and choked the pregnant victim, who was working as a prostitute to support him. The assault left the victim unconscious and with multiple facial fractures, and the Defendant was charged with various offenses related to the assault, including attempted second degree murder, aggravated assault by strangulation, aggravated assault by serious bodily injury, domestic assault, reckless endangerment of the victim's fetus, interference with emergency communications, and evading arrest. When investigators discovered that both the victim and another woman sharing a hotel room with the Defendant were engaging in prostitution for his benefit, he was also charged with promoting prostitution and four counts of trafficking for a commercial sex act, setting out two alternative theories for each victim.

### Pretrial Hearing

The Defendant moved to sever the offenses, contending that the offenses related to the assault, the sexual offenses for each victim, the offense of promoting prostitution, and the offense of evading arrest should all be tried separately. At the hearing, the victim testified regarding her relationship with the Defendant and the circumstances surrounding the offenses.

The twenty-two-year-old victim stated that she had been diagnosed with bipolar disorder, depression, and anxiety in middle school and that her juvenile behavior resulted in suspensions and ultimately in her removal from her mother's home to a juvenile facility. The victim began using marijuana in her early teens, then became addicted to pain killers and eventually to heroin. The victim had a baby while she was a teenager, and the victim's mother cared for the victim's child but had refused to house the victim.

The victim began engaging in acts of prostitution to support her drug habit when she was fifteen. When she met the Defendant, she had been living for a period of months in a Florida hotel, prostituting herself multiple times a day to support a drug habit that could consume as much as $800 per day. The victim met the Defendant when he drove past her and offered to take her to a store, and she ultimately confided in him regarding her life choices and drug addiction.

The victim and Defendant moved to Atlanta, and they began to have a sexual and romantic relationship. The victim stopped using drugs but began to use alcohol. During this time, the victim continued to work as a prostitute. She testified that she was the sole source of income for herself and the Defendant. The victim felt the Defendant had "been

sent by God" because he introduced her to a life where her earnings from prostitution were spent on entertainment, travel, and grooming rather than drugs. She and the Defendant traveled to South Carolina, Texas, Colorado, Las Vegas, and New Orleans, where the Defendant would advertise her as a prostitute online. She acknowledged that prior to meeting the Defendant, she had posted advertisements for herself on the website Backpage and that she occasionally still posted them after she and the Defendant were together, at his direction.

The victim stated that her relationship with the Defendant gradually turned physically and mentally abusive. The Defendant kept all of the money she earned, and the money was no longer spent on travel, entertainment, or the victim's appearance. The victim felt she was "walking on eggshells" and that confrontations were her fault. If the Defendant was in a bad mood, he would force her to strip after acts of prostitution to make sure she was not hiding money. The Defendant would control when she was permitted to leave the room for food; he would monitor her calls to family; and she had to ask him before she could "do anything." She recalled that one day, she was afraid to ask him if she could get a drink of tap water. She stated that the Defendant always kept her identification and debit cards. He also generally kept her telephone, returning it to her when she was with a client.

The Defendant had made indirect threats to the victim's child, warning her, "I wouldn't do that[;] remember, I know where your family stays." The Defendant had also repeatedly threatened her with a gun, putting the gun to her head. The victim stated that when the Defendant physically assaulted her, she would try to be quiet, because any noise would anger him further and because he had threatened to kill her before help could come if she did call for help.

The victim had left the Defendant numerous times but always returned because the he would contact her, because she missed the good times they had had at the beginning of their relationship, and because she did not have anywhere to go, particularly as he had control of her money and ID. She testified that she once left him in a public place and once when they were in custody and released from jail at separate times.

The Defendant and victim were both arrested in Alabama for having a gun in their car. The victim testified that she left the Defendant but returned to him because she felt guilty that his gun charges were still pending while hers had been dismissed and because she intended to earn money for an attorney for the Defendant through prostitution. The victim had also recently discovered that she was pregnant and hoped her pregnancy would change their relationship. The Defendant was concerned about the loss of income that her pregnancy would entail, and the "only option was bringing in another female."

When the victim returned to the Defendant one to two weeks before the assault, she discovered that a friend of hers from Florida had begun staying with the Defendant. She and her friend both engaged in prostitution in Atlanta, with the Defendant posting online advertisements. The Defendant kept the money and purchased bus tickets to come to Nashville. After one night in Nashville, the three moved to a hotel in Brentwood, and the Defendant continued to post advertisements online for the two women to engage in prostitution.

The victim testified that there was a "big difference" in the number of clients she saw compared to the number her friend saw and that her friend received lower offers and fewer calls because she looked "tom-boyish." The Defendant wanted the victim to alter her friend's appearance to make her more profitable. In particular, the victim's friend's hair was problematic because it was very short.

On February 14, 2017, the three had bought Valentine's Day presents and were drinking alcohol. The victim and her friend each saw one or two clients that day, but they "were trying to fix the appearance before we continued really even working," and it was accordingly "a laid-back day." The victim testified that the situation "really escalated" when she could not figure out how to put a hair tie into her friend's hair, which was a different texture from her own. While the victim's friend was in the bathroom, the Defendant began to hit the victim and eventually choked her until she was unconscious. The victim woke between the bed and an air vent, and the Defendant continued the assault. The victim's friend left the bathroom, and the victim and the Defendant went into the bathroom, where he assaulted her again. The victim believed the assault was over, but the Defendant then began to look through the victim's social media accounts, and he became angered when he noticed that a friend of his had commented on one of her photographs. The victim stated that the Defendant began to punch her and raised a bottle of liquor as though to strike her. She testified that although she was normally quiet during an assault, she realized that he did not have the gun with him, and she screamed, "I hate you, get off me, I hate you." The Defendant responded, "I'm going to kill you, bitch." He choked her again until she lost consciousness. When she woke up, she was face-down in blood. She was able to locate the cord of the hotel telephone under the bed, and she plugged it into the telephone and summoned help from the front desk.

The victim acknowledged numerous prior convictions, including theft, possession of cocaine, possession of paraphernalia, resisting arrest, trespass, fraud, and prostitution. She also acknowledged she had a juvenile record which included a home invasion. She agreed that she had lied about her pregnancy after she summoned assistance on the night of the assault, explaining that she feared she would face repercussions for drinking while pregnant. She also acknowledged that she may have told law enforcement that the

- 4 -

Defendant helped her stop abusing drugs, but she stated that she now felt she was manipulated into thinking so and that she believed she had beaten her addiction herself.

Regarding severance, the trial court concluded that the crimes in question took place in close sequence and in the same place. It also concluded that it would be impossible for the jury to understand the case "without proof of one of these offenses spilling over into another offense," in particular because the conflict began with the victim's failure to properly groom another prostitute. Finding that the proof was "inextricably connected," the court concluded that the offenses should be mandatorily joined and that severance was not necessary for a fair determination of the issues.

The Defendant also moved to exclude any evidence of prior crimes or bad acts under Tennessee Rule of Evidence 404(b). In particular, the Defendant challenged any testimony about prostituting or assaulting the victim outside the jurisdiction, about prior arrests, and the victim's testimony that she returned to him to earn money for an attorney for a criminal charge.

The trial court found that the Defendant's conduct in other states was relevant to establishing the elements of the charges of trafficking the victim and promoting prostitution, in particular to whether he attempted to benefit from the commercial sex acts and whether he recruited, enticed, harbored, or transported, provided, purchased, or obtained the victim by any other means. The trial court found the evidence of the acts clear and convincing based on the victim's testimony, and it concluded that the probative value was not substantially outweighed by unfair prejudice. The trial court also found the evidence regarding the gun arrest clear and convincing and relevant to the victim's motivation for staying with the Defendant despite the alleged abuse, and it concluded that the probative value outweighed the prejudicial effect. The trial court offered to give a limiting instruction.

**Trial**

Prior to trial, the State dismissed the two counts of the indictment charging the Defendant with trafficking the victim's friend for a commercial sex act. During opening statements, the prosecutor observed that the victim and Defendant at first would travel for pleasure but later only for the purpose of engaging in prostitution in different cities. The State mentioned the Defendant's possession of a gun in discussing the victim's decision to remain with him. The prosecutor also stated that both the Defendant and victim were taken into custody for the possession of a gun in Alabama and that the victim returned to the Defendant to help him earn money for an attorney. The defense argued that the victim had been a willing participant in prostitution and that the jury could infer that she

had agreed to the suggestion that she was a victim of trafficking in order to avoid any consequences for her own criminal acts.

The victim's testimony at trial was largely consistent with her testimony at the hearing. She spoke about her upbringing, her mental health issues, her expulsion from her mother's home due to drugs, and her reliance on prostitution to support a drug addiction. She reiterated that her relationship with the Defendant was initially very positive, that they began a romantic relationship, that she was able to stop using heroin, and that the money she earned through prostitution was invested in eating out, clothing, and fixing her hair and nails.

The victim testified that she and the Defendant traveled to South Carolina, Texas, Colorado, Ohio, Tennessee, New Orleans, and Las Vegas. The Defendant was unemployed during the entirety of the time they were together, and all of the money they used was earned through the victim's prostitution. She testified that the Defendant kept her identification, her debit cards, and her telephone. She stated that the Defendant would post the majority of the online advertisements for her services as a prostitute but that she also would post advertisements. The Defendant would allow her to keep her telephone when she was with a client, and she would text the Defendant when the client was arriving or leaving.

On cross-examination, the victim denied that the Defendant only held her valuables to prevent potential theft by a client, and she stated he would only allow her to use her telephone freely on "good" days. She agreed that she had the ability to call for help but stated she did not have the courage to do so. She agreed that after a client impersonated a police officer and handcuffed her at their Nashville hotel, she became afraid, and she stated that after that, she would call the Defendant and leave the telephone on for her own safety while she was with a client.

The victim clarified that she had left the Defendant at times she felt physically safe, including once in a public area, once when they were separately released from jail, and once while he was asleep. She testified that when the Defendant would be physically abusive, he would "put [the gun] to my head with a pillow over my head." She stated they were both taken into custody when police found a gun in their car in Alabama and that she left him when they were released on different dates. The victim, feeling guilty that her case was resolved and the Defendant's case was not, returned to the Defendant because she wanted to help earn money for an attorney and because she found out she was pregnant.

The victim testified about the discovery that her friend had joined the Defendant to supplement their income due to the victim's pregnancy. The Defendant sent the victim

text messages indicating that the victim would need to coach her friend to become more profitable. These text messages were introduced as exhibits. Messages from a telephone marked as the Defendant's told the victim, "show her how you rock and she will follow," stated that the victim had "a job to do," and instructed her to conduct herself "in a man[ner] that they will listen to you."

The victim's friend had short hair, and one of the things the Defendant wanted the victim to accomplish was to fix her friend's hair to make it more attractive to clients. The prosecution introduced several Google searches conducted on the victim's telephone regarding hairstyles for African-American women.

The victim testified largely consistently with her prior testimony regarding the day of February 14, 2017. The victim stated that the situation began to "really escalate[]" when she could not figure out how to secure a hair-tie into her friend's hair, which was a different texture from hers. Because the Defendant was angry over the victim's inability to fix her friend's hair, he began to look through the victim's social media accounts, eventually finding the comment from his friend, which further enraged him. The Defendant began to hit the victim while the victim's friend was in the bathroom, and he choked her until she lost consciousness. They went into the bathroom when the victim's friend left it. When the victim's friend left the hotel room, the Defendant began to hit the victim again. The victim cried out when she believed he was preparing to hit her with a liquor bottle and recalled that he did not have the gun with him. The victim testified she had never called for help before, and the Defendant responded by stating he would kill her. She testified that the Defendant kicked her in the stomach with his boots although he knew she was pregnant. She once again lost consciousness after being choked and woke up in blood on the floor.

The victim testified about calling the front desk for help and about her injuries. She identified photographs of herself with marks on her face and neck, a shoe print on her back, and her eyes swollen shut, and she identified a photograph of wads of hair that the Defendant had pulled from her head. The victim suffered multiple facial fractures and testified that she still had dark circles under her eyes as a result of the assault. Officer Kimberly Lamberson of the Brentwood Police Department described and photographed the victim's injuries, including excessive bleeding, swollen eyes, and a busted lip. She stated that the victim did not appear intoxicated. Officer Lamberson could not locate the victim's telephone, identification, or money in the room.

The victim acknowledged that she did not initially tell police that she was engaging in prostitution, and she acknowledged that she told medical personnel that she was not aware of being pregnant. She explained that she feared reprisal for drinking

alcohol while pregnant. She acknowledged her pregnancy and the fact that she was a prostitute to Detective Breedlove when he interviewed her at the hospital.

The victim agreed that she had posted her own advertisements online for prostitution prior to meeting the Defendant, and she acknowledged her juvenile criminal history. She stated that she was able to communicate with friends and family and that she had accounts on social media. She acknowledged that she had posted two pictures on social media which showed her with the Defendant and in which she appeared happy. In one post, she stated he was her "favorite man in th[e] world."

The victim also acknowledged that she had left the Defendant "maybe three" times between the time they were arrested for having the gun in the car and the time of the assault. She agreed that she had gone back to Florida and that they were only in contact through telephone and social media. She stated she suffered a "constant paranoia" when the phone rang or she saw his name. She agreed that she returned and attended his grandmother's funeral in December or January and that she used his mother's mailing address while there.

The victim agreed that she had relapsed and had used drugs when she was in Florida but denied that she left the Defendant because of the urge to use heroin. She acknowledged having taken an ecstasy pill the day before the assault and having consumed approximately five shots of tequila that afternoon. She admitted that she lied when she told medical personnel she only took two shots. She denied having smoked marijuana and explained that medical testing revealed it in her blood because she was "around it." She agreed that her medical records also reflected the presence of methamphetamine in her system. She stated that she told medical personnel that the Defendant had threatened to harm her child, and she explained that while he did not make an explicit threat, he had repeatedly reminded her he knew where she lived, referring to the home where her child stayed.

The victim acknowledged that she had been arrested for possession of cocaine after the assault. She explained that a police officer at a bus station observed her buy cigarettes and asked to search her possessions. She stated that a bag with cocaine residue was found, that she was not aware it was in her possession, and that she would have refused consent to search if she had been aware of the presence of drugs. The victim testified she was currently sober and in a recovery program, that she was living with her mother and caring for her children, and that she was undergoing periodic drug screenings as part of her probation and had passed all of them.

When Officer Lamberson responded to the victim's hotel room, the victim told Officer Lamberson that the Defendant had assaulted her. The victim described the

clothing of her friend, who had apparently left with the Defendant, and the clothing the Defendant was wearing. Officer Lamberson recalled having recently seen two people matching the victim's description walking down the road.

Officer Christopher Maga received a radio description of the Defendant and the victim's friend, including their clothing. He saw two people matching the description near a building, and he made a U-turn and pulled into one entrance to the parking lot by the building with his emergency lights on. The suspects ran south from his vehicle, and when another police vehicle pulled into the lot from the south entrance, the Defendant turned around and ran back north toward Officer Maga. The Defendant was instructed to stop but kept running and attempted to go around Officer Maga. He struggled as he was taken into custody.

The Defendant had two telephones and various identification cards, including one belonging to a woman. The Defendant was asked about blood on his shirt and stated that the blood stains were old. Officer Lamberson collected the Defendant's shirt and his socks, which also bore traces of blood.

Detective Adrian Breedlove of the Brentwood Police Department stated that he had specialized training that involved investigating prostitution and human trafficking and that in performing his duties, he routinely looked at Backpage, a website of classified advertisements that frequently contained advertisements for prostitution. He determined that the website contained advertisements offering the victim and her friend for the purposes of prostitution in Brentwood. He subpoenaed the website's records regarding the postings for the victim and her friend and the records, which were introduced into at trial, reveal that the advertisements were created from the same IP address within minutes of each other on February 12, 2017. Detective Breedlove testified that the website would allow an advertisement to be displayed more prominently near the top of the page if the user paid to "bump" it, and the advertisements for the victim and her friend had both been "bumped" on February 13th and 14th.

Detective Breedlove conducted the search of the victim's telephone which led to the retrieval of her text messages and internet searches. He also sent the Defendant's bloody shirt and socks to be tested for DNA. Detective Breedlove stated that he was unable to get the victim's DNA for comparison because she had left a safe house where he had placed her and because he had no way to contact her, as he still had possession of her telephone. Testing revealed that the blood on the shirt and socks belonged to a woman. He agreed that the victim could have stayed in the safe house for an extended period of time but chose to leave. He stated that the victim had clearly suffered an assault and that he never intended to charge her with prostitution because prostitution was a fairly low-level crime and he had not witnessed her engaging in it.

The defense did not offer any evidence. In closing argument, the prosecutor summarized the proof, including the victim and Defendant's travels together and their arrest for the possession of the firearm. The Defendant argued that the victim was choosing to engage in prostitution, that she had lied numerous times, and that she had unlimited opportunities to leave the Defendant during their travels. The State argued that the Defendant benefitted "[o]ver and over and over and over and over and over again" from the victim's prostitution as they traveled and that while the victim may at first have been a willing participant, he eventually secured her cooperation by assaulting and threatening to assault her and controlling her belongings and movements.

The jury acquitted the Defendant of attempted second degree murder and instead found him guilty of the lesser-included offense of reckless endangerment. The jury also acquitted the Defendant of the count charging trafficking for a commercial sex act by means of recruiting, enticing, harboring, transporting, providing, purchasing or obtaining the victim by any other means. The Defendant was found guilty on the remaining charges, including the two alternative theories of aggravated assault and one count of trafficking for a commercial sex act by means of knowingly subjecting, attempting to subject, benefitting from, or attempting to benefit from the victim's provision of a commercial sex act.

At the sentencing hearing, the trial court merged the reckless endangerment conviction, the two aggravated assaults, and the domestic assault, and it merged the conviction for promoting prostitution into the trafficking conviction. The court sentenced the Defendant as a Range II offender to eleven months and twenty nine days for each misdemeanor, ten years for each aggravated assault, fifteen years for trafficking for a commercial sex act, and three years for promoting prostitution. The sentence for trafficking was to run consecutively to the other offenses for an aggregate sentence of twenty-five years.

**ANALYSIS**

**I. Severance**

The Defendant argues that the trial court erred when it determined that the offenses were subject to mandatory joinder and when it failed to sever the offenses under the criteria for permissive joinder. The State responds that the trial court did not abuse its discretion in finding mandatory joinder, that the trial court's denial of the motion to sever was not error under the standards of permissive joinder, and that even if joinder was improper, any error was harmless. The Defendant responds that the error was not harmless.

## A. Mandatory Joinder

The Defendant asserts that the sexual crimes and the offenses related to the assault are not based on the same conduct and do not arise from the same criminal episode and that the trial court accordingly erred in finding that they should be joined under the provisions governing mandatory joinder. The State responds that the two offenses arose from the same criminal episode. We conclude that the facts demonstrate a break in the action such that the offenses were not required to be joined under the provisions regarding mandatory joinder.

Tennessee Rule of Criminal Procedure 8(a) provides the requirements for mandatory joinder:

> (1) *Criteria for Mandatory Joinder.* Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13, if the offenses are:
>
> (A) based on the same conduct or arise from the same criminal episode;
>
> (B) within the jurisdiction of a single court; and
>
> (C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

When offenses are subject to mandatory joinder, a defendant has a right not to be subject to separate trials for the offenses unless they are severed under Tennessee Rule of Criminal Procedure 14. Tenn. R. Crim. P. 8(a)(2). Under the provisions of mandatory joinder, the trial court shall nevertheless grant severance prior to trial "when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense," or during trial if the defendant consents and the court finds severance "necessary to achieve a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2)(A)-(B). The rule regarding mandatory joinder is designed to "promote efficiency and economy" and "to stop the practice by some prosecuting attorneys of 'saving back' one or more charges arising from the same conduct or from the same criminal episode." Tenn. R. Crim. P. 8, Advisory Comm'n Cmt. Accordingly, failure to join offenses subject to mandatory joinder prevents the State from subsequently prosecuting any charges which were improperly omitted from the prosecution. *State v. Johnson*, 342 S.W.3d 468, 473 (Tenn. 2011).

A trial court's factual findings related to mandatory joinder under Tennessee Rule of Criminal Procedure 8(a) are binding on appeal unless the evidence preponderates otherwise. *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001). When the facts relevant to an issue of joinder are undisputed, the trial court is in essence engaged in the construction and interpretation of the rules of court. *Johnson*, 342 S.W.3d at 471. This court reviews the proper application of Tennessee Rule of Criminal Procedure 8(a) to undisputed facts de novo, with no presumption of correctness. *Id.*

Mandatory joinder applies when offenses arise out of either the same conduct or the same criminal episode. Tenn. R. Crim. P. 8(a)(1). The parties agree that the sexual offenses and assaultive offenses here do not arise out of the same conduct. Offenses that are part of the same criminal episode "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." *Johnson*, 342 S.W.3d at 475. "A break in the action may be sufficient to interrupt the temporal proximity required for a single criminal episode to exist." *Id.* "'A critical characteristic of single episode offenses, particularly in cases involving otherwise unrelated offenses or offenders, is the fact that proof of one offense necessarily involves proof of the others.'" *Id.* at 474 (footnote omitted) (quoting 2 ABA Standards for Criminal Justice § 13–1.2 cmt., at 13.10). The Tennessee Supreme Court has further clarified that the evidence related to the offenses must be inextricably connected or that proof of one offense must form a substantial part of the proof of the other offense. *Id.* at 475. For mandatory joinder to apply under this provision, the overlapping evidence must be more than merely relevant to both crimes. *Id.* at 476.

Accordingly, when the proof of one offense is merely relevant but not inextricably connected with the other, the offenses are not part of the same criminal episode. *Id.* (concluding that a police report falsely claiming that a vehicle used in a robbery had been stolen was not part of the same criminal episode as the robbery, when the report was placed twelve hours after a robbery and in a different location, and when the proof of the offenses, while mutually relevant, was not inextricably connected); *State v. Roy Lee Ellis*, No. W2017-00699-CCA-R3-CD, 2018 WL 673387, at *7 (Tenn. Crim. App. Jan. 31, 2018) (concluding that there was no mandatory joinder of sexual exploitation of a minor offense with aggravated kidnapping, aggravated rape, and aggravated assault, when the defendant had shown the victim explicit photographs on his telephone but the record did not reflect when or where the images were loaded onto the telephone and the proof of the possession of the images was not inextricably connected with the proof of the other crimes), *no perm. app. filed*; *State v. Mario D. Frederick*, No. M2016-00737-CCA-R3-CD, 2017 WL 2117026, at *5 (Tenn. Crim. App. May 15, 2017) (no mandatory joinder when the numerous offenses for solicitation of a minor and indecent exposure spanned fifteen days); *State v. Demeko Gerard Duckworth*, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *13 (Tenn. Crim. App. May 10, 2013) (joinder was not mandatory

because although two murders were committed approximately one hour apart and in the same city, proof from either murder would not necessarily constitute proof of the other); *State v. Brandon Churchman*, No. W2013-00175-CCA-R3-CD, 2014 WL 12651043, at *8 (Tenn. Crim. App. Apr. 28, 2014) (concluding that mandatory joinder did not apply even though there was "a substantial overlap in evidence," when the defendants' robbery of one victim was relevant to establishing their identity in a subsequently committed murder, but the offenses demonstrated a break in the action and no continuity of place).

On the other hand, when offenses are very closely related so that the proof is inextricably entwined and there is no break in the action, the offenses must be joined under the Rule. *See State v. Carruthers*, 35 S.W.3d 516, 572-73 (Tenn. 2000) (appendix) (charges of three counts of first degree murder were properly joined with three counts of especially aggravated kidnapping and one count of especially aggravated robbery because they involved the same three victims and arose from the same criminal episode); *State v. Shepherd*, 902 S.W.2d 895, 904 (Tenn. 1995) (mandatory joinder was applied where aggravated assault offenses were committed during an investigation of first degree murder and the proof was accordingly inextricably connected); *State v. Caruthers*, 676 S.W.2d 935, 940 (Tenn. 1984) (first degree murder of one victim was inextricably connected with the contemporaneous kidnapping and robbery of both victims and assault of the second victim); *Gary Wayne Johnson v. State*, No. M2013-02034-CCA-R3-PC, 2014 WL 5840231, at *9 (Tenn. Crim. App. Nov. 12, 2014) (the offenses were the "textbook definition" of a continuing criminal episode and were mandatorily joined when the defendant overpowered a prison guard at the hospital and proceeded to rob other individuals of their cars before kidnapping a man to drive him out of the state); *State v. Michael Jason Vance*, No. M2011-02469-CCA-R3-CD, 2013 WL 6001954, at *25 (Tenn. Crim. App. Nov. 12, 2013) (offenses of evading arrest, making a false police report, and unlawful possession of a deadly weapon were mandatorily joined with first degree murder because the offenses occurred in close sequence, were interrelated, and because the first degree murder charge would necessarily require proof of the other charges as relevant to premeditation); *State v. Scotty Dale Staggs*, No. M2011-01675-CCA-R3-CD, 2013 WL 2722286, at *14 (Tenn. Crim. App. June 12, 2013) (offenses of aggravated burglary, theft, and evading arrest were mandatorily joined when the offenses occurred in close sequence and closely situated places and the evading arrest offense was committed during the investigation of the other offenses); *Baird*, 88 S.W.3d at 621 (offenses were subject to mandatory joinder when the defendant's involvement in a gambling enterprise continued with no interruption in time, but two indictments charging offenses occurring in successive periods of time were returned).

In the case at bar, the Defendant was charged with attempted second degree murder, aggravated assault by strangulation, aggravated assault by serious bodily injury, domestic assault, reckless endangerment of the victim's fetus, interference with

- 13 -

emergency communications, evading arrest, promoting prostitution, and various counts of trafficking for a commercial sex act. The Defendant argues on appeal that the trial court should have severed the trafficking and promotion of prostitution offenses from the other offenses.

The indictment charged the offenses related to the assault as occurring on February 14, 2017; the trafficking for a commercial sex act offenses were charged as occurring between January 1, 2017, and February 14, 2017; and the promotion of prostitution was charged as occurring between February 10, 2017, and February 14, 2017. Accordingly, it appears that the sexual offenses were charged as spanning a period of days, whereas the assaultive offenses took place on the 14th. The evidence presented at the hearing established that the Defendant had posted advertisements for the victim to engage in prostitution in Nashville and subsequently in Brentwood.

The assault at issue had its roots in the Defendant's frustration that the victim was unable to fix her friend's hair to make her friend more appealing as a prostitute. The victim testified that although she may have seen one or two clients that day, the Defendant had decided that they should focus on fixing the victim's friend's appearance before the victim and her friend could continue working. She testified that the three went to a store to buy Valentine's Day presents, that they were drinking in the hotel room, and that it was "kind of a laid-back day." The victim's testimony and the dates in the indictment indicate a break in the action between the sexual offenses and the assault such that the offenses do not constitute one criminal episode.[1] Although, as we discuss further below, the proof related to the offenses is mutually relevant, it is not inextricably entwined. Accordingly, we conclude that the offenses were not properly tried together pursuant to mandatory joinder.

### B. Permissive Joinder

The Defendant argues that, under the principles of permissive joinder, the trial court erred when it refused to sever the offenses. He asserts that the State did not establish a common scheme or plan and that he was entitled to a severance under Tennessee Rule of Criminal Procedure 14(b)(1). The State responds that if joinder was not mandatory, the offenses were subject to permissive joinder, the trial court did not

---

[1] We note that the trial court found that there was proof before it that an advertisement was posted on February 13th or 14th, but the transcript of the hearing does not reflect any proof regarding when the advertisements were posted, although the State's written response to the severance motion references exhibits to the motion which are not in the record on appeal. In any event, the victim's testimony that she and her friend were not working, that they were attempting to correct her friend's appearance, and that they intended to relax that day sufficiently establishes a break in the action.

abuse its discretion in denying severance, and any error was harmless.  We conclude that the offenses were properly joined under the principles of permissive joinder and that the trial court did not err in refusing severance.

A trial court's decisions regarding permissive joinder or severance pursuant to Tennessee Rule of Criminal Procedure 14(b)(1) are reviewed for abuse of discretion. *Spicer v. State*, 12 S.W.3d 438, 442-43 (Tenn. 2000) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)); *State v. Quantez Person*, No. W2016-01945-CCA-R3-CD, 2018 WL 447122, at *3 n.2 (Tenn. Crim. App. Jan. 16, 2018).  The trial court may exercise its discretion only "when the offenses are parts of a common scheme or plan *and* when the offense sought to be severed would be admissible as evidence in the trial of the other offenses." *Shirley*, 6 S.W.3d at 247.  A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party.  *State v. Dotson*, 254 S.W.3d 378, 387–88 (Tenn. 2008).  On appeal, we look only to the evidence presented at the hearing on the motion to sever to determine if the trial court abused its discretion.  *Spicer*, 12 S.W.3d at 445.  If a trial court did not conduct the necessary analysis regarding joinder or severance, the appellate court "must conduct the analysis that the trial court failed to conduct." *State v. Garrett*, 331 S.W.3d 392, 404 (Tenn. 2011).

Tennessee Rule of Criminal Procedure 8(b) governs permissive joinder:

(b) **Permissive Joinder of Offenses.** Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:

(1) the offenses constitute parts of a common scheme or plan; or

(2) they are of the same or similar character.

In a case of permissive joinder, the defendant may nevertheless be entitled to a severance under Tennessee Rule of Criminal Procedure 14(b):

(1) …. If two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others.

The principles governing the propriety of permissive joinder differ from those governing a subsequent severance, and therefore "a defendant may have the right to a severance of offenses even when those offenses were properly joined initially."  *Spicer*,

- 15 -

12 S.W.3d at 443. "'The primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed.'" *Dotson*, 254 S.W.3d at 386 (quoting *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984)). Accordingly, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Garrett*, 331 S.W.3d at 402 (quoting *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)). The Rule does not require that each offense be relevant to a material issue in all the other offenses, only that evidence of one offense be admissible in the trial of the others. *Dotson*, 254 S.W.3d at 387 n.5. The trial court must hold a hearing on the motion for a severance and may deny severance only if it determines that:

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

*Id.* at 387 (footnote omitted) (citing *Spicer*, 12 S.W.3d at 445).

To constitute a common scheme or plan, the offenses must either be: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *Shirley*, 6 S.W.3d at 248. The State argues that the offenses were part of a continuing plan or part of an ongoing criminal transaction. Crimes which are part of the same criminal transaction are admissible "when it is necessary to provide the trier of fact with a full and essential understanding of the crime on trial." *State v. John Allen Murphy, Jr.*, No. M2007-02416-CCA-R3-CD, 2009 WL 1643442, at *7 (Tenn. Crim. App. June 12, 2009) (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[13] (5th ed.2005)). However, such evidence of other crimes "'should be limited to those so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the "other" crime.'" *Id.* at *8 (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[13] (5th ed.2005)).

"[A] larger, continuing plan or conspiracy 'involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447); *see State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). In other words, the plan "'operat[es] towards the future with such force as to make probable the crime for which

the defendant is on trial.'" *State v. Prentice*, 113 S.W.3d 326, 331 (Tenn. Crim. App. 2001) (quoting *Hoyt*, 928 S.W.2d at 943). A shared motivation for two otherwise unrelated crimes is not sufficient, but "[e]ach of the consolidated offenses must serve to further the goal or plan in existence at the time of the commission of the first offenses." *State v. Timothy Leron Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *28 (Tenn. Crim. App. Apr. 8, 2019), *perm. app. denied* (Tenn. Aug. 15, 2019); *see, e.g., State v. Hall*, 976 S.W.2d 121, 146 (Tenn. 1998) (numerous burglaries and thefts and two murders were all part of a common scheme or plan by escaped inmates to avoid recapture); *State v. Deredious Otis, Brashard Gibbs, and Carlos Key*, No. W2016-01261-CCA-R3-CD, 2018 WL 931131, at *7 (Tenn. Crim. App. Feb. 15, 2018), *perm. app. denied* (Tenn. June 8, 2018) (two shootings were part of a common plan to seek revenge for a burglary and theft); *State v. Osborne*, 251 S.W.3d 1, 12-13 (Tenn. Crim. App. 2007) (the defendant's sexual offenses against his daughter and another minor victim were part of a common scheme or plan when he used his daughter's friendship with the other victim and his status as the victim's babysitter to commit the offenses); *State v. Morris*, 788 S.W.2d 820, 823 (Tenn. Crim. App. 1990) (the defendant's sexual offenses were part of a common scheme or plan to molest the victims when they were committed against members of a tumbling group); *State v. Wiseman*, 643 S.W.2d 354, 363 (Tenn. Crim. App. 1982) (multiple offenses were part a common scheme to defraud the county); *but see Garrett*, 331 S.W.3d at 405 (concluding that an aggravated robbery and murder committed on consecutive days were not part of a larger plan or conspiracy and not part of the same criminal transaction); *Denton*, 149 S.W.3d at 15 (concluding that a medical provider's sex offenses were not part of continuing plan or conspiracy based only on the fact that they were committed for sexual gratification); *Prentice*, 113 S.W.3d at 332 (two instances of violence committed against the victim were not part of a common plan to terrorize her, and the proof of one offense would not have been admissible in the trial for the other); *Hallock*, 875 S.W.2d at 290 (defendant's sexual abuse of minor children in his household was not part of a common scheme or plan merely because it was for the purpose of sexual gratification).

Here, the evidence at the hearing established that the Defendant's sole source of income came from the victim's acts of prostitution. The Defendant accordingly would arrange travel to various cities, arrange accommodations where the victim could engage in prostitution, and post advertisements online to attract clients. In order to maintain control over the victim, the Defendant dispossessed her of her identification, money, and telephone. The Defendant threatened her with a gun in order to ensure her compliance. The victim also testified that the Defendant's ongoing physical abuse facilitated his ability to control her actions, including dictating when she was permitted to eat or drink. She stated that the physical abuse contributed to her decision to stay with him, testifying that she had only left him in public spaces or when he was asleep because she was afraid he would hurt her otherwise. The Defendant had procured the services of a second

prostitute, the victim's friend, in order to supplement his income during the victim's pregnancy. The victim attributed the assault on Valentine's Day to her inability to coach her friend to be adequately profitable, stating that the situation "really escalated" when she was unable to secure a hair tie in her friend's hair. We conclude that the Defendant's physical abuse of the victim, including the February 14th assault, was part and parcel of his continuing plan to subdue the victim in order to profit from the victim's prostitution, and that this satisfies the requirement of a "'common goal or purpose.'" *Denton*, 149 S.W.3d 1, 15; *see United States v. Davis*, 241 F. Supp. 3d 261, 263–64 (D. Mass. 2017) ("Evidence of conduct, including allegations of physical abuse and withholding heroin from drug-addicted women, separated by just a few months, even in different states, can be probative of intent to coerce prostitution and a common coercive prostitution scheme."). Accordingly, the first criterion of a common scheme or plan is met, and we proceed to consider whether the offenses are relevant to some material issue in the trial of the other offenses and to consider the appropriate balancing of the probative and prejudicial value of the evidence.

Because the primary inquiry in a question of severance under Rule 8(b)(1) is whether the evidence of one crime would be admissible in the trial of the others, the requirement that evidence of one of the offenses be relevant to some material issue in the trial of the other offenses and the balancing of the probative and prejudicial value of the evidence is in essence an analysis under Tennessee Rule of Evidence 404(b). *See Spicer*, 12 S.W.3d at 445 (enumerating the three required findings by the trial court and citing Tennessee Rule of Evidence 404(b) as authority for requiring that the evidence be relevant to some material issue and that its probative value not be outweighed by any prejudicial effect).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This is to prevent the jury from convicting the defendant of a crime based on propensity rather than proof of guilt of a specific offense. *Garrett*, 331 S.W.3d at 402 (citing *Dotson*, 254 S.W.3d at 387). "Accordingly, any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant." *Id.* at 403. Rule 404(b), however, permits evidence when offered to prove some issue other than character or propensity relevant to trial. *Moore*, 6 S.W.3d at 239. Material issues on which 404(b) evidence may bear include: "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004) (appendix); *State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000). If the offenses sought to be severed are not relevant to prove a material issue in conformity with Rule 404(b), then severance should be granted. *See State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003) (the

defendant's two separate acts of child abuse were not relevant to identity, intent, or any other material issue, and the two offenses should have been severed).

In evaluating propensity evidence, the trial court must adhere to the following procedure:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). In general, a court should take a restrictive approach to admitting evidence under Rule 404(b) because of the potential that the jury will be unfairly influenced. *Dotson*, 450 S.W.3d at 76. "'Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (quoting *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998)). The danger of unfair prejudice is increased if the prior bad act was similar to the crime at issue at trial. *State v. Adams*, 405 S.W.3d 641, 659 (Tenn. 2013).

A brief review of the elements of the offenses with which the Defendant was charged is pertinent. The attempted second degree murder charge required the state to prove the Defendant's specific intent to commit a knowing killing of another. *See* T.C.A. § 39-12-101(a); T.C.A. § 39-13-210(a)(1). For the aggravated assault by strangulation charge, as charged here, the State had to demonstrate that the Defendant intentionally or knowingly caused the victim bodily injury and that the act involved strangulation. T.C.A. §§ 39-13-102 (a)(1)(A)(iv) (2014), -101(a)(1). To prove aggravated assault by serious bodily injury, the State was required to establish that the Defendant intentionally or knowingly caused the victim bodily injury and that the assault resulted in serious bodily injury. T.C.A. §§ 39-13-102 (a)(1)(A)(i), -101(a)(1). For domestic assault, the State had to present proof that the Defendant intentionally, knowingly, or recklessly caused bodily injury to the victim, who was a domestic abuse victim. T.C.A. §§ 39-13-

111(b), -101(a)(1). For the charge of reckless endangerment of the victim's fetus, the State was required to prove that the Defendant recklessly engaged in conduct which placed or might have placed another person in imminent danger of death or serious bodily injury. T.C.A. § 39-13-103(a). The Defendant was also charged with interference with emergency communications, which required proof that he intentionally rendered a telephone unusable and that the telephone would otherwise have been used to request emergency assistance from an agency whose purpose is to provide for the safety of individuals. T.C.A. § 65-21-117(b). To show that the Defendant was guilty of evading arrest, the State had to show that he intentionally fled from a person he knew to be a law enforcement officer and that he knew the officer was attempting to arrest him. T.C.A. § 39-16-603(a)(1)(A).

For the first trafficking charge, the State had to demonstrate that the Defendant knowingly subjected, attempted to subject, benefitted from, or attempted to benefit from the victim's provision of a commercial sex act. T.C.A. § 39-13-309(a)(1). The alternative trafficking charge required proof that the Defendant recruited, enticed, harbored, transported, provided, purchased, or obtained by any other means, another person for the purpose of providing a commercial sex act. T.C.A. § 39-13-309(a)(2). The means referenced in this subsection include "[c]ausing or threatening to cause physical harm to the person" and knowingly removing, confiscating, or possessing the victim's government identification document. T.C.A. § 39-13-309(b)(1), (4). To demonstrate that the Defendant promoted prostitution as charged to the jury, the State had to establish that he intentionally, knowingly, or recklessly received benefit from soliciting a person to patronize a prostitute. T.C.A. §§ 39-13-515(a)(1); -512(4)(A)(vi).

The elements of the alternative trafficking charge explicitly make the assault relevant, because statute provides that the Defendant causing or threatening to cause physical harm to the victim may establish the means by which he obtained her for the purposes of providing a commercial sex act. Furthermore, the sex trafficking and promoting prostitution charges are relevant to the Defendant's motive and intent in the assaultive offenses. The victim testified that the Defendant's sole source of income was taking her earnings from prostitution. She further testified that the Defendant was physically abusing her, that she was afraid of the Defendant, and that fear of further abuse was one reason she did not leave him. The victim stated that the assault was the culmination of the Defendant's frustration that she was pregnant and would not be able to earn income, that her friend was not as profitable as he had hoped, and that she had been unable to groom her friend's hair in order to increase her friend's profitability. *See State v. March*, 395 S.W.3d 738, 783-84 (Tenn. Crim. App. 2011) (prior misconduct with a female coworker was relevant to the defendant's motive to kill his wife); *State v. Moss*, 13 S.W.3d 374, 384 (Tenn. Crim. App. 1999) (prior bad acts committed against the defendant's daughter were relevant to supply a motive and intent for the murder of his

wife). Accordingly, we conclude that the offenses were properly admissible under Rule 404(b).

The offenses were part of a common scheme or plan aimed at the Defendant's profiting off of the victim's continued engagement in prostitution. *See Davis*, 241 F. Supp. 3d at 263-64. The evidence regarding the assault was relevant to the sexual offenses, and the evidence regarding the sexual offenses established the Defendant's motive to commit the assault. The trial court found that the probative value of the evidence was not outweighed by its prejudicial effect. Accordingly, we conclude the trial court did not err in denying severance.

## II. Tennessee Rule of Evidence 404(b) Evidence of Prior Bad Acts

The Defendant also objects to the trial court's decision to permit the State to introduce evidence of his previous bad acts, including prior postings advertising the victim for prostitution in other jurisdictions, his arrest on a weapons offense in Alabama, and his repeated assaults and threats to the victim. We conclude that the evidence was relevant to material issues other than character and that the trial court did not abuse its discretion in admitting the evidence.

As noted above, evidence of prior bad acts committed by the defendant is not admissible as propensity evidence but may be admissible for the limited purpose of proving motive, intent, identity, absence of mistake or accident, opportunity, a common scheme or plan or to provide contextual background. *State v. Giles*, 493 S.W.3d 504, 522 (Tenn. Crim. App. 2016). The trial court must upon request hold a jury-out hearing, must find that the prior bad act is established by clear and convincing evidence, must determine that the proof bears on a material issue other than character and on request memorialize the specifics of the ruling, and must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). When a trial court has complied with the dictates of Rule 404 in determining the admissibility of prior bad acts, its ruling is reviewed for abuse of discretion. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014). Otherwise, the determination of admissibility is made by the reviewing court. *Id.*; *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997).

Here, the trial court held a hearing outside the presence of the jury, determined that the evidence of the bad acts was clear and convincing, and concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court, in making its oral ruling, concluded that the evidence bore on the context of the parties' relationship and the circumstances surrounding the crime. The Defendant notes that, in denying the motion to exclude the evidence under Rule 404(b), the trial court's written order recited:

If the evidence establishes that [the Defendant] engaged in the conduct alleged in [the trafficking and promoting prostitution offenses] in places other than Tennessee the evidence would be relevant to establish that he engaged in such conduct with [the victim] in Tennessee. As a consequence, the evidence is material on issues other than conduct conforming to a character trait.

The Defendant correctly points out that this reasoning is precisely the type of character evidence that the Rule is designed to exclude. We nevertheless observe that the evidence is relevant to establishing a material issue other than character trait.

The evidence that the Defendant's livelihood was based on his continued act of prostituting the victim was relevant to his motive and intent in the offenses at issue. The Defendant's economic dependence on the victim and her inability to continue supporting the Defendant provided a motive for his physical attack on her, including his kicks to her pregnant abdomen. Evidence that the Defendant had lived off of the victim's earnings in the past was also relevant to his intent to benefit from her engaging in prostitution, his intent in transporting her, and to the existence of a common scheme or plan. The Defendant was also charged with attempted second degree murder, which required the State to prove that the Defendant had the specific intent to commit a knowing killing. The Defendant's prior physical abuse was likewise relevant to his motive and intent to harm the victim in this count. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993) (noting that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim"); *Michael Jason Vance*, 2013 WL 6001954, at *11, 13 (concluding that evidence of the parties' "stormy relationship" and the "Defendant's prior bad acts towards the victim were relevant to show Defendant's motive and intent"); *State v. Coulter*, 67 S.W.3d 3, 48 (Tenn. Crim. App. 2001) ("Among the relevant circumstances are facts about the defendant's prior relationship and conduct with the victim from which the jury may infer a motive."), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401, 407 n.3 (Tenn. 2005).

Furthermore, as noted above, one of the trafficking charges was comprised of recruiting, enticing, harboring, transporting, providing, purchasing, or obtaining by any other means, another person for the purpose of providing a commercial sex act. T.C.A. § 39-13-309(a)(2). The statute defines "by any means" to include "[c]ausing or threatening to cause physical harm to the person." T.C.A. § 39-13-309(b)(1). Evidence that the Defendant had previously physically abused the victim and routinely threatened her with a gun was relevant to explain why the victim had not left the Defendant even though she testified that she was not physically restrained. It also explained why the victim would

- 22 -

credit the Defendant's threats of harm. The victim testified that she called for help only because she believed he would strike her with a liquor bottle and because she recalled that he did not have possession of the gun, and she stated that the Defendant's statement that he would kill her was prompted by her cries. The evidence was likewise relevant to showing that the Defendant acted knowingly when he attempted to benefit from the victim's acts of commercial sex. The physically abusive relationship and the Defendant's possession of a weapon were accordingly relevant to a material issue other than character.

We also conclude that the trial court did not abuse its discretion in balancing the prejudicial and probative value of the evidence. While the evidence was certainly not favorable to the Defendant, the proof was confined to a brief description by the victim of the course of her relationship with the Defendant. The victim's preliminary testimony also included admissions unfavorable to her own credibility, including her drug use and habitual prostitution, prior criminal history, and arrest on the possession of the weapon in Alabama. The Defendant, in noting the prejudicial value of the evidence, emphasized that the prosecutor referred to the Defendant's benefitting from the victim's acts of prostitution "over and over and over…" again in other jurisdictions, but this was in response to the Defendant's argument that the victim had had "limitless" opportunities to leave the Defendant in other jurisdictions. We conclude that, particularly in light of the overwhelming evidence regarding the offenses, the admission of the evidence was not unduly prejudicial. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE